COOLEY GODWARD KRONISH LLP
KOJI F. FUKUMURA (189719)
(kfukumura@cooley.com)
AARON F. OLSEN (224947)
(aolsen@cooley.com)
4401 Eastgate Mall
San Diego, CA  92121
Telephone:(858) 550-6000
Facsimile:(858) 550-6420

Attorneys for Defendants
Quest Software, Inc.,
Vincent C. Smith, Michael J. Lambert,
Douglas F. Garn, David M. Doyle,
and Kevin Brooks

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT

## SOUTHERN DIVISION

| | |
|---|---|
| MIDDLESEX RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>QUEST SOFTWARE, INC., VINCENT C. SMITH, M. BRINKLEY MORSE, MICHAEL J. LAMBERT, DOUGLAS F. GARN, DAVID M. DOYLE, JERRY MURDOCK, JR., and KEVIN BROOKS,<br><br>Defendants. | Case No. CV06-6863 DOC (RNB)<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br>DATE:      May 12, 2008<br>TIME:      8:30 A.M.<br>CTRM:      9D<br>JUDGE:     Hon. David O. Carter |

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

**Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................. 1

II.  STATEMENT OF FACTS ................................................................... 4

    A.  Quest's Method for Granting Stock Options: IPO – April 30, 2002 .......................................................................................... 4

    B.  The 1999 Stock Incentive Plan Allowed Quest to Grant "In-The-Money" Stock Options ....................................................... 5

    C.  Quest Determines that a Compensation Charge Must Be Taken ........ 7

    D.  Individual Defendants ................................................................. 8

III.  PROCEDURAL HISTORY ................................................................. 9

IV.  APPLICABLE PLEADING STANDARDS ........................................ 10

V.  THE 10B-5 CLAIM MUST BE DISMISSED FOR FAILURE TO ALLEGE SCIENTER ......................................................................... 11

    A.  Knowledge of Quest's "Bucket and Best Price" Methodology Does Not Establish an Intent to Defraud Investors ..................... 12

        1.  The Grantee Defendants' options were granted pursuant to the same "bucket and best price" methodology that was already in place .................................................................. 14

        2.  Neither the Defendants' presence at nor positions in the Company contribute to a strong inference that they intended to defraud Quest's investors ................................. 15

        3.  The size of the restatement does not evidence scienter ........... 17

    B.  The SAC Does Not Adequately Allege a Violation of the 1999 Stock Incentive Plan ................................................................ 19

    C.  Plaintiff's Remaining Arguments Do Not Show a Strong Inference of Scienter ................................................................ 20

        1.  Stock sales do not show scienter ............................................. 20

        2.  Departure of Morse and Reassignment of Brooks do not show scienter ........................................................................ 21

VI.  PLAINTIFF FAILS TO ALLEGE A SCHEME ................................. 22

VII.  THE SECTION 20(A) CLAIMS SHOULD BE DISMISSED ............ 23

VIII.  PLAINTIFF HAS NOT STATED A CLAIM FOR INSIDER TRADING ........................................................................................ 24

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i.

**Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)**

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alaska Elec. Pension Fund v. Adecco*
   371 F. Supp. 2d 1203 (S.D. Cal. 2005) ........................................................... 16

*AST Research Sec. Litig.,*
   887 F. Supp. 231 (C.D. Cal. 1995) ................................................................... 24

*Balistreri v. Pacifica Police Dept.,*
   901 F.2d 696 (9th Cir. 1990) ........................................................................... 10

*Bell Atlantic Corp. v. Twombly,*
   --- U.S.---, 127 S. Ct. 1955 (2007) ........................................................... 10, 24

*Buban v. O'Brien,*
   No. C 94-0331 FMS, 1994 WL 324093 (N.D. Cal. June 22, 1994) ................. 24

*DSAM Global Value Fund v. Altris Software,*
   288 F.3d 385 (9th Cir. 2002) ........................................................................... 21

*Fidel v. Farley,*
   392 F.3d 220 (6th Cir. 2004) ........................................................................... 18

*Howard v. Everex Sys., Inc.*
   228 F.3d 1057 (9th Cir. 2000) ......................................................................... 23

*In re Adaptive Broadband Sec. Litig.,*
   No. C 01-1092 SC, 2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ...................... 21

*In re BearingPoint, Inc. Sec. Litig.,*
   525 F. Supp. 2d 759 (E. D. Va. 2007) ............................................................. 21

*In re Connetics Corp. Sec. Litig.,* No. C 07-02940 SI, 2008 WL
   269467 (N.D. Cal. Jan. 29, 2008) .................................................................... 24

*In re Copper Mountain Sec. Litig.,*
   311 F. Supp. 2d at 883 ..................................................................................... 23

*In re Cornerstone Propane Partners, L.P. Sec. Litig.,*
   355 F. Supp. 2d 1069 (N.D. Cal. 2005) ........................................................... 13

*In re Dura Pharm., Inc. Sec. Litig.,*
   452 F. Supp. 2d 1005 (S.D. Cal. 2006) ............................................................ 20

*In re Hansen Natural Corp. Sec. Litig.,* --- F. Supp. 2d ---, 2007 WL
   3244646 (C.D. Cal. Oct. 16, 2007) .................................................................. 15

*In re ICN Pharm. Sec. Litig.,*
   299 F. Supp. 2d 1055 (C.D. Cal. 2004) ................................................ 3, 13, 16, 20

*In re Intelligroup Sec. Litig.,*
   --- F. Supp. 2d ----, 2007 WL 3376743 (D.N.J. Nov. 13, 2007) ..................... 21

*In re McKesson HBOC Sec. Litig.,*
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ........................................................... 21

*In re Read-Rite Corp. Sec. Litig.,*
   335 F.3d 843 (9th Cir. 2003) ........................................................................... 11

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii.

**Defs.' Mem. of P. & A.  ISO of MTD SAC**
**CV06-6863 DOC (RNB)**

# TABLE OF AUTHORITIES
## (continued)

Page

*In re Silicon Graphics, Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ........................................................... 10, 20

*In re Sportsline.com Sec. Litig.*,
366 F. Supp. 2d 1159 (S.D. Fla. 2004) ............................................. 15

*In Re US Aggregates, Inc. Sec. Litig.*,
235 F. Supp. 2d 1063 (N.D. Cal. 2002) ............................................ 13

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) .................................................. 11, 16, 20

*In re VeriFone Sec. Litig.*,
784 F. Supp. 1471 (N.D. Cal. 1992) ................................................. 24

*Jablon v. Dean Witter*,
614 F.2d 677 (9th Cir. 1980) ............................................................ 24

*Neubronner v. Milken*,
6 F.3d 666 (9th Cir. 1993) ................................................................ 24

*SEC v. Todd*,
No. 03CV2230, 2006 WL 1564892 (S.D. Cal. May 30, 2006) ........ 13

*Simpson v. AOL Time Warner*,
452 F.3d 1040 (9th Cir. 2006) .................................................... 22, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
127 S. Ct. 2499 (2007) ..................................................... 1, 9, 10, 11

*Weiss v. Amkor Tech., Inc.*, --- F. Supp. 2d ----, 2007 WL 2808224 (D.
Ariz. Sept. 25, 2007) .................................................................... 15

STATUTES

15 U.S.C. § 78u-4(b) ......................................................... 1, 3, 10, 11, 19

15 U.S.C. §78t(a) ............................................................................... 23

OTHER AUTHORITIES

CAL. CODE REGS. tit. 10 § 2608.01 ..................................................... 6

Section 422(b)(4) of the Internal Revenue Code ................................ 6

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii.

Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)

1    Defendants Quest Software, Inc. ("Quest" or "Company"), Vincent C. Smith,
2    Michael J. Lambert, Douglas F. Garn, David M. Doyle, and Kevin Brooks
3    (collectively "Officer Defendants") respectfully move the Court to dismiss Plaintiff
4    Middlesex Retirement System's ("Plaintiff") Second Amended Complaint
5    ("SAC").

6    ## I.    INTRODUCTION

7        Viewed holistically,[1] the facts alleged in the first and second amended
8    complaints paint starkly different pictures, which lead to starkly different
9    conclusions.  The gravamen of the First Amended Complaint ("FAC") was that
10   Defendants conspired to "pick" option grant dates in the past so as to reap for
11   themselves substantial paper profits.  In contrast, the SAC's incorporated facts are
12   the antithesis of conspiratorial, self-enriching decisions made in smoke-filled
13   rooms.  Instead, the SAC reveals a flawed administrative process that this then-
14   nascent public company implemented to deal with explosive growth in new
15   employees after its IPO.  The differences between these two pictures, one insidious
16   and the other a flawed process in hindsight, make clear that Plaintiff has failed to
17   plead a cogent and compelling inference that Defendants acted with intent to
18   defraud Quest's investors.  Absent such a compelling inference, the Officer
19   Defendants, the Company and its shareholders must be protected from the
20   enormous adverse business impact and expense of discovery in a class action of this
21   type. *See* 15 U.S.C. 78u-4(b)(3).

22       When it initially sold shares to the public in August 1999, Quest had no
23   formal stock option granting policy.  (*See* Quest's 2006 Form 10-K attached as Ex.
24   B to the Appendix "App." at 68.)  In the Fall of 1999, Quest implemented a "bucket
25   and best price" methodology with respect to stock option grants to newly-hired

26

---

[1] As the U.S. Supreme Court recently reiterated, courts must not only consider the
27   facts alleged in the complaint but also "documents incorporated into the complaint
by reference, and matters of which a court may take judicial notice." *Tellabs, Inc.*
28   *v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007).

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)

employees.  (SAC ¶ 175; 2006 10-K, App. Ex. B at 68.)  Under that methodology, all new employees receiving stock option grants were placed in buckets based on the month they signed their offer letter (e.g., the October 1999 grants, the November 1999 grants, etc.) with a strike price corresponding to the lowest closing stock price for that month.  (*Id*.)  Later, to obtain the requisite administrative approval of these bucket grants, the Company created lists of grants by bucket and attached those lists, along with the corresponding price for each bucket, to unanimous written consents ("UWCs") for execution by the Board or Compensation Committee.  (SAC ¶ 177; 2006 10-K, App. Ex. B at 68.)  This same practice was then applied to annual company-wide grants beginning in the Spring of 2000.  (2006 10-K, App. Ex. B at 68.)

In hindsight, it is clear that the Company's methodology was flawed.  Unlike board/committee minutes that are drafted after the fact to document prior decisions, recent interpretations of the accounting rules governing equity-based compensation focus on the date when a UWC was "finally" executed (*i.e.*, when the last signature was received creating unanimity)[2] for purposes of determining an accounting measurement date.  (*See* Letter dated September 19, 2006 from the Chief Accountant of the SEC, App. Ex. E at 262-63.)  It is this focus on "finality" in the administrative granting process that drove Quest to revise the measurement dates of its past option grants, which in turn led to the recent restatement.

Plaintiff's case, however, cannot proceed on the basis of a flawed methodology.  Deeply rooted in the statutes and jurisprudence governing securities fraud is the fundamental mandate that a complaint make a strong showing of each

---

[2]  This focus now adheres despite the fact that the persons executing the UWC (members of a board or compensation committee) are performing a perfunctory, administrative duty with respect to options granted to non-executive employees.  Common sense dictates that directors on a board or compensation committee do not meaningfully contribute to the decision whether, for example, a newly-hired mid-level software engineer deserves 1,000 options, a sales person deserves 800 options, or a mailroom clerk deserves 100 options.  Those decisions are obviously made by management and simply ratified by the board or compensation committee.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

2

Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)

defendant's intent to defraud.  The SAC does not satisfy this mandate.  The SAC lacks particularized facts demonstrating that any defendant knew during the relevant period that Quest's option granting methodology was flawed.  Indeed, given that more than a hundred companies used similar "best price" methodologies (SAC ¶ 80), a more compelling inference from the facts pled in the SAC is that the Company's stock option granting practice was in line with similarly-situated public companies and that Defendants were not aware that it was flawed.

More importantly, however, the SAC lacks any particularized facts identifying **any** "red flags" or other warnings from which it could be inferred that any Defendant understood that the flawed option-granting methodology caused the Company's financial statements to be materially misstated.  *See In re ICN Pharm. Sec. Litig.*, 299 F. Supp. 2d 1055, 1065 (C.D. Cal. 2004).  In fact, the SAC fails to cite even a single witness or contemporaneous document available to these Defendants that could even arguably have put them on notice that a problem existed.

Undeterred by the absence of any direct facts supporting scienter, Plaintiff complains that Defendants should have known Quest's process was flawed because the Company's methodology allegedly violated its stock option plans.  Plaintiff's allegations are fatally flawed.  First, pursuant to the Company's publicly-filed documents (incorporated by reference in the SAC), the Company could grant non-statutory stock options at below market value on the grant date.  Only statutory tax qualified incentive stock options were required to be granted at 100% fair market value.  The SAC does not contain any well-pled facts alleging that **even a single** at-issue stock option grant was a tax qualified incentive stock option.  Plaintiff's theory that the option grants involved in the restatement violated Quest's stock option plans, therefore, is completely conclusory.  Because these allegations are made solely on information and belief, they cannot support a strong inference of

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

3

**Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)**

1  scienter under the Private Securities Litigation Reform Act ("PSLRA").  *See* 15
2  U.S.C. § 78u-4(b)(1).

3  **II.   STATEMENT OF FACTS**

4    Quest designs, develops, distributes and supports software products that
5  improve the performance of software applications and database management
6  systems.  (SAC ¶ 16.)  During the technology boom of the late 1990s, Quest grew
7  rapidly – from 654 employees at the end of 1999 to 1,813 employees in 2002.
8  During this period of explosive employee growth, Quest granted approximately
9  19.4 million stock options to new and existing employees:   Approximately 4
10  million options in 2000, 8.9 million options in 2001, and 6.5 million options in
11  2002.  (SAC ¶ 6.)  Approximately 84% of the stock options granted during that
12  period were issued to rank-and-file employees and independent contractors.  (SAC
13  ¶¶ 91-103; 2006 10-K, App. Ex. B at 70.)  The remaining 16% were granted to
14  Defendants.  (*Id.*)

15    **A.   Quest's Method for Granting Stock Options: IPO – April 30, 2002**

16    At the time of its IPO, Quest did not have a formal stock option granting
17  policy.  (*See* 2006 10-K,  App. Ex. B at 68.)  In the Fall of 1999, Quest
18  implemented a "bucket and best price" methodology for granting stock options to
19  employees.[3]  (*See* SAC ¶ 175.)  Under this methodology, all stock option grants for
20  a particular month were aggregated into one bucket.[4]  (*Id.*)  Thus, for example, the

21  ───────────────────

22  [3] The vast majority of compensation expense recognized by the restatement relates
to stock options granted between September 1999 and April 2002; only $278,000
23  arises from grants made after May 1, 2002.  (2006 10-K, App. Ex. B at 71-72.)  The
facts alleged in the SAC and found in documents incorporated by reference are
24  unequivocal that the post May 2002 adjustments were not caused by the use of any
granting practice utilizing "hindsight" (2006 10-K, App. Ex. B at 68; SAC ¶ 175),
25  and so have nothing to do with the SAC's fraud allegations.
[4] "Beginning in late 1999, we changed our stock option granting practices by
26  implementing a practice where we typically dated new hire and merit grants to
employees on a monthly basis, where the grant date for any given new hire would
27  be based on the month during which the new hire signed an employment offer letter
or started employment with the Company.  When option grants were granted to
28  existing employees as merit grants, they were approved using the same practice and

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

4                    **Defs.' Mem. of P. & A.  ISO of MTD SAC**
**CV06-6863 DOC (RNB)**

October 1999 grant would be comprised of employees who were hired in, promoted during or identified as worthy of merit during October.  (SAC ¶ 175; 2006 10-K, App. Ex B at 68.)  Pursuant to this methodology, the grant date for each monthly "bucket" was the date corresponding to the lowest closing sales price for that month.  (SAC ¶ 175.)  Until May 2002, this methodology was used to grant stock options to all employees.  (*Id.*)  Thus, **all** grantees (whether they were a low-level employee or the most senior executive at the Company) who fell into the same bucket received the same exercise price.  (*Id.*)

Quest utilized UWCs to administratively approve the granting actions.  (*Id.* at ¶ 176.)  The UWCs bore an "as of" date corresponding to the grant date associated with each bucket.[5]  (*Id.*)  As a function of the "bucket and best price" methodology, the UWCs were always executed on a date later than the selected grant date.  (*Id.* at ¶ 177.)

**B.    The 1999 Stock Incentive Plan Allowed Quest to Grant "In-The-Money" Stock Options**

Shortly before its IPO, Quest approved the 1999 Stock Incentive Plan (the "1999 Plan").  (SAC ¶ 87; 1999 Plan, App. Ex. C.)  The 1999 Plan defined two types of stock options: (1) Non-Statutory Stock Options; and (2) Incentive Stock Options.  (*See* "Non-Statutory Option" and "Incentive Option" in the Appendix of Definitions attached to the 1999 Plan, App. Ex. C at 243.)  The 1999 Plan defined Non-Statutory Stock Options as "an option **not intended to** satisfy the requirements of Code Section 422."  (*Id.*) (emphasis added).  In contrast, the 1999

---

included in the monthly new-hire grant procedure.  Option grants for these grants for a given month were dated as of the trading date during that month on which the closing price for our Common Stock reported by Nasdaq was determined to be the lowest monthly closing price, and the exercise price established for those option grants was the closing sale price of the Common Stock on such date.  We made annual or broad-based company-wide grants in 2000, 2001 and 2002 to executive and non-executive employees as of the grant dates determined on the same basis as new hire or merit grants." (2006 10-K, App. Ex. B at 68.)

[5]  Far from being evidence of fraud – using the term "as of" in a UWC candidly discloses that the UWC was executed after the granting action.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

Plan defined an Incentive Option as "an option which satisfies the requirements of Code Section 422." (*Id.*)  The 1999 Plan set different rules for these two types of stock options.

The most significant difference between the two types of stock options—and, not coincidentally, the distinction ignored by Plaintiff—is that Quest had much broader administrative discretion to determine exercise prices when granting Non-Statutory Stock Options.  Specifically, Non-Statutory Options did not have to be granted at "100% of Fair Market Value" – that requirement *only* applied to Incentive Stock Options. (*See* Article Two, § II: "Incentive Options" in the 1999 Plan, App. Ex. C at 224) ("The terms specified below shall be applicable to all **Incentive Options**: . . .  The exercise price per share shall not be less than one hundred percent (100%) of the Fair Market Value per share of Common Stock on the option grant date.") (emphasis added)[6].  The 1999 Plan allowed Quest complete discretion in selecting the exercise price for stock options issued after Quest's IPO, and did not require a minimum fair market value exercise price. (*See* Article Two, § I – A: "Exercise Price" in the 1999 Plan, App. Ex. C at 222) ("The exercise price per share shall be fixed by the Plan Administrator at the time of the option grant . . . .").[7]

The 1999 Plan also gave the plan administrator broad discretion in all other aspects of the stock option granting procedure.  The plan administrator had broad discretion to: (1) "establish such rules as it may deem appropriate for proper administration of the Plan"; (2) "construe and interpret the provisions of the Plan"; (3) choose the recipient of the stock option awards; (4) "determine . . . the time or

---

[6] This exercise price requirement for incentive stock options is specifically required by Section 422(b)(4) of the Internal Revenue Code ("the option price is not less than the fair market value of the stock at the time such option is granted").

[7] Consistent with California law governing ***private*** California corporations, Non-Statutory Stock Options issued prior to Quest's IPO (which occurred on Aug. 13, 1999), could not be granted at less than 85% of the Fair Market Value.  CAL. CODE REGS. tit. 10 § 2608.01.  This 85% requirement was, by its terms, eliminated at the time of the Company's IPO.

COOLEY GODWARD KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

6

Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)

1  times when [stock option] awards are to be made"; and (5) determine the amount of

2  options to be received.  (*See* Article One, § III of 1999 Plan: "Administration of

3  Plan," App. Ex C at 219.)

**C.    Quest Determines that a Compensation Charge Must Be Taken**

5  The year 2006 ushered in an era of heightened scrutiny of stock option

6  granting practices and procedures.  (SAC ¶ 81.)   Over 190 companies either

7  announced internal reviews of their own stock option granting practices or were the

8  subject of a regulatory or criminal investigation.  (SAC ¶ 80.)  In mid-2006, one

9  academician published research "that found that more than 2,000 companies had

10  likely employed backdated stock options."  (SAC ¶ 81.)

11  On May 19, 2006, an investment bank issued a report stating that Quest's

12  public disclosures suggested "unusually well-timed option grants."  (SAC ¶ 152.)

13  Immediately thereafter, and well before any lawsuit or investigation began, Quest

14  promptly and voluntarily formed a Special Committee of independent directors to

15  investigate comprehensively the Company's historical stock option grant practices

16  and related accounting.   (SAC ¶ 158.)   During the course of a seven-month

17  investigation, the Special Committee and its advisors reviewed voluminous

18  electronic and hard copy documents, including files of the Company's current and

19  former employees, officers, and directors involved in the administration and

20  approval of, as well as in the accounting for, stock option grants. (2006 10-K, App.

21  Ex. B at 67.)   In addition to analyzing the documentary record, the Special

22  Committee's lawyers interviewed more than 20 individuals, including current and

23  former employees, officers and directors, with key knowledge of the Company's

24  option granting practices.  (*Id.*)  At the conclusion of its investigation, the Special

25  Committee made no finding of fraud or intentional misconduct by any current or

26  former employees, officers or directors.  (*Id.* at 70.)  The Special Committee also

27  concluded that certain non-cash adjustments should be made to prior period

28  financial statements.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

7                    **Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)**

### D.   Individual Defendants

The  SAC names the following seven individuals as defendants:

Vincent C. Smith:   Chairman of the Board (since 1998); CEO (since 1997); Director (since 1995).  (SAC ¶ 20.)  Mr. Smith allegedly signed each Form 10-K and 10-K405 filed during the Class Period  (SAC ¶ 21), and sold 445,300 shares of Quest stock between October 19, 2004 and May 16, 2006.  (SAC ¶ 202.)

M. Brinkley Morse:  V.P. Finance and Operations (Jan. 2001 – May 2003); CFO (May 2003 – Apr. 2005); Sr. V.P. Corporate Development (Apr. 2005 – Nov. 2006.)  (SAC ¶ 27.)  Mr. Morse allegedly signed each Form 10-K and 10-K405 between 2002 – 2005.  (SAC ¶ 28.)  Mr. Morse declined to be interviewed by the Special Committee as part of its investigation and resigned in November 2006. (SAC ¶ 27.)  The SAC does not allege that Mr. Morse sold any Quest stock during the Class Period.

Michael J. Lambert: Sr. V.P. Finance (Nov. 2004 – Apr. 2005); CFO (since Apr. 2005).  (SAC ¶ 33.)  Mr. Lambert allegedly signed the Form 10-K filed in 2006.  (SAC ¶ 34.)  The SAC does not allege that Mr. Lambert sold any Quest stock during the Class Period.

Douglas F. Garn:  V.P. Worldwide Sales (Jan. 1998 – Jan. 2002; Jan. 2003 – Feb. 2005); President (since Feb. 2005).  (SAC ¶ 38.)  Mr. Garn allegedly sold 65,000 shares of Quest stock during the Class Period.  (SAC ¶ 204.)

David M. Doyle:  Co-founder; Director (1987 – Jun. 2004); President (until Mar. 2003); Audit Committee member (1999 – 2001).  (SAC ¶ 43.)  Mr. Doyle allegedly signed each Form 10-K and 10-K405 between 2002 – 2004 (SAC ¶ 44) and sold 1,974,543 shares of Quest stock between September 2002 and February 2004.  (SAC ¶ 203.)

Jerry Murdock Jr.:   Outside Director (since Apr. 1999); Compensation Committee member (1999 – Feb. 2005); Audit Committee member (1999 – present).  (SAC ¶ 49.)  Mr. Murdock allegedly signed each Form 10-K and 10-

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

8

Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)

K405 during the Class Period (SAC ¶ 52), and sold 200,000 shares of Quest stock in April 2003 and 2,274 shares in March 2005.  (SAC ¶ 205.)

<u>Kevin Brooks</u>:  V.P. and Corporate Controller (Sept. 2000 – Oct. 2006). (SAC ¶ 56.)  Mr. Brooks allegedly signed each Form 10-Q, 10-K, and 10-K405 filed during the Class Period (SAC ¶ 57), and sold 57,620 shares between January 2003 and May 2006.  (SAC ¶ 206.)

### III.   PROCEDURAL HISTORY

Plaintiff filed its FAC on March 26, 2007.  On May 25, 2007, Defendants moved to dismiss the FAC pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the PSLRA, 15 U.S.C. §78u, *et seq*.  Defendants' primary argument for dismissal of the §10(b) claim was that Plaintiff failed to plead a "strong inference" of scienter with the particularity required by the PSLRA, as interpreted by *Tellabs*, 127 S. Ct. at 2499.  (*See* Defs.' Mem. of P&A's in Supp. of Mot. to Dismiss FAC at 7-16.)

In its October 22, 2007 Order, the Court denied the motion to dismiss.  On November 27, 2007, Defendants filed a Motion for Certification of Order for Interlocutory Appeal Pursuant to §1292(b).

On January 18, 2008, Plaintiff filed its SAC, which specifically relied upon disclosures made in the Company's 2006 Annual Report.  (*See* SAC ¶¶ 172-186 ("Further Admissions in Quest's Restatement").)

In light of the SAC's new allegations, on January 24, 2008, Defendants applied on an *ex parte* basis for leave to file motion for alternative relief, allowing Defendants to file a motion to dismiss the SAC.  In its January 29, 2008 Order, the Court held in abeyance Defendants' Motion for Certification, deemed moot Defendants' Motion for Alternative Relief, and permitted Defendants to file the present motion to dismiss the SAC.  (*See* Jan. 29 Order, Doc. No. 66, at 2-3.)

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

9          Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)

## IV.   APPLICABLE PLEADING STANDARDS

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits dismissal of a claim that either lacks a cognizable legal theory or where plaintiff alleges insufficient facts to support it.  *See Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990); *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).

In addition, a complaint alleging violations of the federal securities laws must satisfy the significantly heightened pleading requirements of the PSLRA.  *See In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 979 (9th Cir. 1999) ("Congress intended for the [PSLRA] to raise the pleading standard even beyond the most stringent existing standard.").  Under the PSLRA, a complaint must plead both falsity and scienter with particularity.  *See* 15 U.S.C. §78u-4(b)(1)-(3).  With regard to scienter, a plaintiff must "with respect to each act or omission . . . state with particularity facts giving rise to a strong inference" that ***each defendant*** acted with intent to defraud or with deliberate recklessness.  *See* 15 U.S.C. §78u-4(b)(2); *see also In re Silicon Graphics*, 183 F.3d at 979 (complaint must establish that each defendant acted with deliberate or conscious recklessness).

The Supreme Court mandated that district courts ***shall*** dismiss as insufficient those factual allegations from which an inference of scienter only "could" be drawn.  *See Tellabs,* 127 S. Ct. at 2510.  To qualify as "strong" within the meaning of the PSLRA, an inference of scienter must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.* at 2505.  "[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court . . . must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff. . . but also competing inferences rationally drawn from the facts alleged."  *Tellabs*, 127 S. Ct. at 2504.  While a sufficient inference need not be "irrefutable," nor the "most plausible of competing inferences," it must be *at least*

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

10

**Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)**

1   *as strong as any other inferences* that could be drawn in favor of defendants. *Id.* at

2   2510 (defining "strong" as "[p]ersuasive, effective, and cogent [and] [p]owerful to

3   demonstrate or convince," and defining "inference" as "a conclusion [drawn] from

4   known and assumed facts or statements" or "reasoning from something known.")

5   Additionally, the court must consider *all* facts alleged, incorporated by reference

6   and subject to judicial notice. *Id.* at 2509.

7       Finally, Plaintiff cannot establish a strong inference of scienter by pleading

8   the mere existence of facts without *also* pleading with particularity that *each*

9   *Defendant* both knew of those facts *and* understood contemporaneously their

10  downstream accounting implications. *See* 15 U.S.C. §78u-4(b)(2); *see also In re*

11  *Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1090-91 (9th Cir. 2002); *In re Read-Rite*

12  *Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003) (complaint must plead "specific

13  contemporaneous statements or conditions that demonstrate the intentional or

14  deliberately reckless false or misleading nature of the statement when made.")

15  (internal quotations omitted).

16      As discussed below, because Plaintiff has not pled with particularity any

17  facts demonstrating knowledge that Quest's option dating methodology was flawed

18  *and* contemporaneous understanding that the flaw had an accounting impact that

19  materially misstated the Company's financial statements, the SAC fails to establish

20  scienter.   Indeed, the new facts alleged in the SAC fatally undermine the very

21  scienter allegations this Court found sufficient to uphold the FAC.   As such, the

22  SAC must be dismissed.

23  **V.   THE 10B-5 CLAIM MUST BE DISMISSED FOR FAILURE TO ALLEGE**
24  **SCIENTER**

25      Plaintiff was obligated, but failed, to plead a strong inference that Defendants

26  intended to defraud Quest's investors by presenting a false picture of the

27  Company's then-current financial condition and operating results.  Plaintiff has pled

28  no direct facts showing any Defendant's state of mind.   Instead, Plaintiff relies

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

11

**Defs.' Mem. of P. & A.  ISO of MTD SAC**
**CV06-6863 DOC (RNB)**

solely on the following circumstantial facts:  (i) Defendants[8] were the recipients of misdated options and therefore can be presumed to have known about the flawed methodology; (ii) the size of the restatement; (iii) Defendants' presence at the Company and their high-level positions; (iv) the presumption that Defendants knew the contents of financial reports based upon their signatures on those reports; and (v) an alleged violation of the 1999 Plan and Defendants' presumed knowledge of that violation.  None of these facts, alone or taken together, is sufficient to plead a strong inference of scienter.

### A.   Knowledge of "Bucket and Best Price" Methodology Does Not Establish an Intent to Defraud Investors

In hindsight, Quest does not dispute that the "bucket and best price" methodology – an employee benefits procedure – was flawed.   That single undisputed allegation, however, is insufficient to plead securities fraud under the PSLRA.   Indeed, the SAC does not contain a single fact showing that any Defendant knew the methodology was flawed at the time it was employed, *i.e. during the September 1999 to May 2002 time period*.  More importantly, the SAC does not contain a single well-pled fact creating a nexus between awareness of the methodology and guilty knowledge that the financial statements were materially misstated.[9]  In fact, the SAC does not allege a single "red flag," "whistleblower," or contemporaneous document or witness that even arguably put any Defendant on

---

[8] It cannot be disputed that Jerry Murdock **did not** receive a single misdated option.  (SAC ¶¶ 49 – 53; 2006 10-K, App. Ex. B at 70) ("*None of our non-employee directors received stock option grants requiring measurement date corrections*.").  Additionally, the SAC does not allege that Michael Lambert, who joined the Company in 2004, years after use of the "bucket and best price" methodology ended, either received any misdated options or would have any reason to know that a flawed practice previously had been used.  (SAC ¶ 33.)

[9] To the contrary, Plaintiff concedes that the stock option granting policies of up to 2,000 U.S. public companies were similarly flawed in that they led to misdated options.  (SAC ¶¶ 80-1.)  As such, a more cogent and compelling inference from the facts pled in the SAC is that Quest had no reason to question its methodology because this employee benefits procedure was in line with the procedures many other public companies employed at the time.

COOLEY GODWARD KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

12

**Defs.' Mem. of P. & A.  ISO of MTD SAC**
**CV06-6863 DOC (RNB)**

notice that the Company's financial statements, as filed, were materially misstated. The absence of such a factual nexus is, as a matter of law, fatal to the SAC.  *See SEC v. Todd*, No. 03CV2230, 2006 WL 1564892, at *7 (S.D. Cal. May 30, 2006) (rejecting securities fraud claim against CEO of public company and finding that "knowledge of the existence of the [challenged] transactions does not allow a reasonable fact-finder to draw an inference that [the CEO] had knowledge of their impropriety. . . ."); *In re ICN Pharm. Sec. Litig.*, 299 F. Supp. 2d at 1065 (complaint dismissed where plaintiffs offered no "detailed evidence of the contemporaneous decision-making behind the alleged accounting errors. . . ."); *See also In re Cornerstone Propane Partners, L.P. Sec. Litig.,* 355 F. Supp. 2d 1069, 1091 (N.D. Cal. 2005) ("In order to distinguish 'deliberate recklessness' from 'ordinary carelessness,' allegations of GAAP violations must be augmented by 'facts that shed light on the mental state' of defendants, rather than conclusory allegations that defendant must have known of the accounting failures due to the degree of departure from established accounting principles."); *In re US Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1073 (N.D. Cal. 2002) ("[E]ven an obvious failure to follow GAAP does not give rise to an inference of scienter.").

Previously, in the FAC, Plaintiff relied on the fact that certain defendants received misdated options and (successfully) urged this Court to find that the receipt of misdated options demonstrates a strong inference of scienter.  (Order, Doc. No.  51, at 18) ("Collectively, Defendants were the recipients of literally millions of option grants . . . it is simply incomprehensible that for such large option grants Defendants would not have been keenly aware of the option measurement date and the resulting value of the option grants.")  The SAC sheds new light on this important point.

COOLEY GODWARD KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

1        **1.    The Grantee Defendants'[10] options were granted pursuant to the same "bucket and best price" methodology that was already in place**

3    The SAC's contention that Defendants' receipt of misdated options demonstrates they must have known something was wrong is fatally conclusory. No Grantee Defendant received a misdated option until well after the "bucket and best price" methodology was first implemented. (2006 10-K, App. Ex. B at 74.) Doug Garn, then the VP of Worldwide Sales, received his first misdated option in April 2000, after the methodology was already in place.  (*Id.*) (identifying misdated and re-priced options received by Section 16 Officers.)  The remaining Grantee Defendants received their first misdated options more than one and a half years after the methodology was implemented (Mr. Smith, Apr. 4, 2001; Mr. Morse, Apr. 4, 2001; Mr. Brooks, Oct. 1, 2001).  (*Id.*)

13    There is no dispute that these April 2000 and April 2001 options were granted under the "bucket and best price" methodology (SAC ¶ 175; 2006 10-K, App. Ex. B at 68), and were part of annual, broad-based, company-wide grants ("Company Wide Grants") that were simply included in the "bucket'" for the period in which the grants were made.  (*See* 2006 10-K, App. Ex. B at 68) ("We made annual or broad-based, company-wide grants in 2000, 2001 and 2002 to executive and non-executive employees as of grant dates ***determined on the same basis as new hire or merit grants***.") (emphasis added).

21    The granting decisions made with respect to the Officer Defendants, therefore, were not "special grants" that might arguably raise questions about process and procedure.  The SAC contains no allegations explaining why these grants, as opposed to any of the other myriad grants made in the same way, would

---

[10] The term "Grantee Defendants" refers only to Messrs. Smith, Morse, Garn and Brooks.  Mr. Murdock is an outside director.  (SAC ¶ 49.)  Mr. Lambert was not an employee of the Company when the "bucket and best price" methodology was in use.  (SAC ¶ 33.)  Neither Mr. Murdock nor Mr. Lambert is alleged to have received any misdated options.

CooLEY Godward Kronish LLP
Attorneys At Law
San Diego

14          **Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)**

raise "red flags" or other warnings.  To the contrary, these grants were made in the same manner and pursuant to the same pre-existing procedure as those made to the rank-and-file employees of the Company.  Far from evidencing scienter, using the same pre-existing procedure used to grant options on a Company-wide basis as that used to grant the Defendants' challenged options actually negates intentional misconduct.  *See Weiss v. Amkor Tech., Inc.*, --- F. Supp. 2d ----, 2007 WL 2808224, at *8-*9 (D. Ariz. Sept. 25, 2007) (finding that although some options appear to have been backdated, plaintiff failed to allege facts giving rise to a strong inference of scienter); *In re Hansen Natural Corp. Sec. Litig.*, --- F. Supp. 2d ---, 2007 WL 3244646, at *11 (C.D. Cal. Oct. 16, 2007) ("Plaintiff's failure to plead any facts related to the role or knowledge of any of the Officer Defendants or any Individual Defendant's involvement in the alleged backdating scheme is fatal to Plaintiff's showing of scienter both with respect to the Officer Defendants and with respect to [the Company]"); *In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1168–69 (S.D. Fla. 2004) (allegations that stock options accounting issues that required restatement of two and a half years of financial statements were insufficient to plead scienter).  The simple receipt of misdated options does not plead scienter

### 2. Neither the Defendants' presence at nor positions in the Company contribute to a strong inference that they intended to defraud Quest's investors

Playing off the inference above, Plaintiff next contends that, given the sheer number of misdated option grants, Defendants knew Quest's financial statements were materially incorrect because they were either employed at the Company or served on its Board of Directors when those misdated options were granted.  (SAC ¶¶ 198-200.)  In its prior ruling on Defendants' motion to dismiss the FAC, the Court found these allegations compelling:  "Indeed, it is simply incomprehensible that for such large option grants Defendants would not have been keenly aware of the option measurement date and the resulting value of the option grants.  Given

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

15

Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)

1    that Defendants' respective positions on the Compensation Committee, Audit

2    Committee, as CFOs, etc. would have given Defendants detailed knowledge of

3    when the options were actually granted . . . ." (Order, Doc. No. 51, at 18.) As

4    detailed in the preceding section, however, the facts in the FAC and the facts in the

5    SAC present starkly different pictures.

6         In contrast to the SAC, the FAC did not include allegations detailing a pre-

7    existing, consistently applied methodology for granting stock options. The most

8    cogent and compelling inference to draw from the pre-existing, routinely used

9    methodology described in the SAC is that there was no need for any individual

10   defendant to scrutinize the option granting process when it came to their own grants

11   – it was the same process for everyone.

12        Additionally, the SAC does not allege any "red flags" or other warnings that

13   this routinely applied methodology was flawed or, more importantly, that the flaws

14   gave rise to material accounting implications. Without that factual nexus, these

15   allegations about presence at and positions in the Company are no different than

16   allegations that courts, including this Court, have found patently insufficient to

17   plead a strong inference of scienter. *See, e.g., In re Vantive Corp. Sec. Litig.*, 283

18   F.3d at 1090-91 ("[the complaint] fails to allege specific contemporaneous

19   conditions known to the defendants that would strongly suggest that the defendants

20   understood that their recognition of revenues . . . was 'excessive'. . . ."); *Alaska*

21   *Elec. Pension Fund v. Adecco,* 371 F. Supp. 2d 1203, 1217 (S.D. Cal. 2005)

22   ("Rather than presume individual officer and director defendants must have known

23   about a fraud by virtue of their positions within the defendant company, 'the

24   persuasive force of each situation must be evaluated individually.'"); *In re ICN*

25   *Pharm. Sec. Litig.*, 299 F. Supp. 2d at 1064 ("As in *Silicon Graphics*, Plaintiffs fail

26   to state specific facts relating to the alleged communications that put ICN

27   management on notice. . . .")

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

16

Defs.' Mem. of P. & A. ISO of MTD SAC
CV06-6863 DOC (RNB)

### 3.    The size of the restatement does not evidence scienter

The size of the restatement does not evidence scienter.    The amount of additional compensation expense the Company – *in 2006* – decided to record in prior periods was driven purely by investigative decisions made in 2006 – years after the fact.   Those decisions, in turn, were driven by the administrative approval process attendant to the "bucket and best price" methodology:

> For each of the 21 discretionary grants affected by the Special Committee's findings during this period [Sep. 1999 through Apr. 2002], **the Special Committee determined an accounting measurement date based on** information and documentation evidencing **the date as of which the related action by unanimous written consent ("UWC") had been signed by <u>all</u> of the directors**, or in the case of Compensation Committee action, members of the Compensation Committee.

(2006 10-K, App. Ex. B at 71) (emphasis added).   To illustrate this point, consider the April 14, 2000 grant.   The original exercise price was $26.50.   (SAC ¶ 91, 2006 10-K, App. Ex. B at 68.)   The Special Committee assigned an amended exercise price of $55.25.   (*See* 2006 10-K, App. Ex. B at 74.)   The Special Committee chose $55.25 because it was the closing price on the date that the last signature on the UWC was received (June 23, 2000).   (*Id*; and Stock Price Chart, App. Ex. A.) **Thus, by virtue of the process the Special Committee established in 2006, it determined that a $28.75 charge per option must now be taken and applied to prior periods.**   When the grant is made to many employees on a company-wide basis, the resulting, restated number is *a fortiori* very large.   For example, if 1.5 million options were part of the April 14, 2000 grant, the compensation charge would be over $40 million ($28.75/option multiplied by 1,500,000 options would produce $43,125,000 charge).[11]

---

[11] This hypothetical is for demonstrative purposes only.   The SAC does not allege how many options were granted on April 14, 2000 (though it does allege that Quest granted approximately 4 million options in 2000 and April 14 is the only grant date specifically challenged by Plaintiff from 2000.) (SAC ¶ 91.)   The Court need not

COOLEY GODWARD KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

The Special Committee's decisions in this regard, all made in 2006, generated large charges that the Company has now applied to prior periods.  Those 2006 decisions, however, reveal <u>nothing</u> about Defendants' state of mind in 2000. The SAC is silent regarding the key points that would evidence an intent to defraud:

- There are no facts demonstrating that Defendants understood the "bucket and best price" methodology was flawed;
- There are no "red flags" or other warnings suggesting that using the "bucket and best price" methodology would result in a material compensation expense;
- There are no facts suggesting that the April 14 grant was not placed or did not belong in the April Bucket; and,
- There are no facts suggesting that Defendants understood that the last signature date on a UWC would be the determining factor for accounting purposes.

The absence of these facts renders the size of the restatement, which is a function of the mechanical process the Special Committee employed, of little value in evaluating whether the SAC has pled a strong inference of scienter.  *See Fidel v. Farley*, 392 F.3d 220, 231 (6th Cir. 2004) ("Allowing an inference of scienter based on the magnitude of fraud [a $220 million restatement] 'would eviscerate the principle that accounting errors alone cannot justify a finding of scienter.'"); *see also Weiss*, 2007 WL 2808224, at *8-9 (granting motion to dismiss and finding that a $106 million restatement could not used to show scienter).

---

find that the charge was, in fact, $43,125,000.  Rather, this illustrates a rational inference the Court should draw from the facts alleged – that given the procedures the Special Committee applied, the size of the restatement does not bear, one way or another, on the state of mind of these Defendants.

Cooley Godward Kronish LLP
Attorneys At Law
San Diego

18

Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)

B.   **The SAC Does Not Adequately Allege a Violation of the 1999 Stock Incentive Plan**

Plaintiff's allegation that Quest violated the 1999 Plan is predicated on a mischaracterization of the Plan itself.   Plaintiff alleges that "all of the options granted to Quest employees" were tax qualified incentive stock options - the type that had be awarded at 100% of the fair market value on the grant date.   (SAC ¶ 88).   This allegation, in turn, was a factor in this Court's finding that the FAC sufficiently pled a strong inference of scienter.   (*Compare* SAC ¶ 88 *with* Oct. 22, 2007 Order, Doc. No. 51, at 26) ("[t]he 1999 Plan makes clear that **all** option grants are to be awarded at 100% of the fair market value as of the measurement date") (emphasis added).

**Non-Statutory Stock Options vs. Incentive Stock Options:** Plaintiff's conclusory allegations are misleading because they ignore the fact that Quest could grant two types of options: Non-Statutory Stock Options and Incentive Stock Options.[12]  As discussed above, the 1999 Plan gave Quest very broad administrative discretion when granting Non-Statutory Options.  (*See* Section II B.)  Even now in the SAC, Plaintiff ignores this distinction and labels all the stock options as "incentive options" and assumes that they must meet the fair-market-value requirements applicable only to Incentive Stock Options.  (*Compare* SAC ¶¶ 88-90 *with* 1999 Plan, Article II, § I − A, II − A, and Definitions Appendix: Incentive Option and Non-Statutory Options; App. Ex. C at 222, 224, and 243.)   This speculation has no foundation.   There are **no** well-pled facts supporting a conclusion that any at-issue option was a tax-qualified incentive stock option. Accordingly, this allegation is made on information and belief and must be disregarded unless it meets the stringent requirements of the PSLRA governing allegations made on information and belief.  *See* 15 U.S.C. § 78u-4(b)(1) ("if an

---

[12] Section II B, *supra*, discusses the differences between these two types of options in more detail.

COOLEY GODWARD KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

19

**Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)**

allegation regarding [a] statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."); *see also In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at 985; *In re ICN Pharm., Inc. Sec. Litig.*, 299 F. Supp. 2d at 1066 (dismissing allegations because they were "devoid of the requisite corroborating details").[13]   Because Plaintiff has not and cannot state with particularity **any** facts in support of this conclusory allegation, it cannot support a strong inference of scienter.

### C.   Plaintiff's Remaining Arguments Do Not Show a Strong Inference of Scienter

### 1.   Stock sales do not show scienter

This Court has already determined that stock sales by Defendants in this case are by themselves insufficient to establish scienter.  (*See* Order, Doc. No. 51, at 22) ("further analysis is required").  Moreover, not a single aspect of Defendants' sales weighs in favor of establishing scienter.  Corporate directors and officers sell stock as a matter of course.  In the Ninth Circuit, "[i]nsider stock sales. . . become [suspicious] only when the level of trading is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'"  *In re Vantive Corp. Sec. Litig.*, 283 F.3d at 1092.  Here, as the Court noted, "the disclosure of Quest's backdating came without any forewarning to Defendants." (*See* Order, Doc. No. 51, at 21.)   Without knowing the time of disclosure of inside information, both the amount of shares sold and the timing of those sales are irrelevant for the purpose of establishing scienter.  (*See* Order, Doc. No. 51, at 20-22.)  Accordingly, because Defendants are not alleged to have known (nor could they) about the date of disclosure of Quest's stock option granting practices and accounting, neither the amount or percentage of shares sold

---

[13] *See also In re Dura Pharm., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1024 (S.D. Cal. 2006) (allegations not claimed to be based on plaintiff's personal knowledge are based on information and belief).

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

20

**Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)**

(see *id*. at 20-21) nor timing of those sales (see *id*. at 21-22) can be used to support an inference of scienter.

### 2. Departure of Morse and reassignment of Brooks do not show scienter

Plaintiff's allegations of executive departures do not create a strong inference of scienter.

**First**, with respect to Mr. Morse, Plaintiff alleges no specific facts to show that his resignation was the result of fraudulent, as opposed to negligent, conduct. "Negligence, even gross negligence, does not rise to the level of the nefarious mental state necessary to constitute securities fraud under the PSLRA . . . ." *DSAM Global Value Fund v. Altris Software*, 288 F.3d 385, 391 (9th Cir. 2002). With respect to Mr. Brooks, on the other hand, this Court has already found that "allegations regarding Brooks' reassignment do not support a finding of scienter." (*See* Order, Doc. No. 51, at 22.)

**Second**, a defendant's resignation can only "constitute a 'piece to the scienter puzzle' if the resignation both takes place within a couple of months of the announcement of the errors committed **and** is accompanied by an extraordinary corporate punishment measure, *e.g.*, denial of severance payment." *In re Intelligroup Sec. Litig.*, --- F. Supp. 2d ----, 2007 WL 3376743, at *63 (D.N.J. Nov. 13, 2007) (emphasis added) (citing *In re Adaptive Broadband Sec. Litig.*, No. C 01-1092 SC, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) and *In re McKesson HBOC Secs. Litig.*, 126 F. Supp. 2d 1248 (N.D. Cal. 2000)); *see also In re BearingPoint, Inc. Sec. Litig.*, 525 F. Supp. 2d 759, 777 (E.D. Va. 2007) ("retirements and resignations of executives do not support a strong inference of scienter.") With respect to Mr. Morse, the SAC does not allege that his resignation was accompanied by any such measures.

**Third,** even where a special committee has made a finding of fraud or intentional misconduct, such a finding does not necessarily support an inference of

Cooley Godward Kronish LLP
Attorneys At Law
San Diego

21

**Defs.' Mem. of P. & A. ISO of MTD SAC**
**CV06-6863 DOC (RNB)**

1   scienter.  *See Weiss*, 2007 WL 2808224, at *9-*10.  In contrast, Quest's "Special

2   Committee made no finding of fraud or intentional misconduct by any current or

3   former employees, officers or directors. . . ." (2006 10-K, App. Ex. B at 70.)

4   **VI.   PLAINTIFF FAILS TO ALLEGE A SCHEME**

5        Plaintiff's  scheme  allegations  fail  to  satisfy  the  PSLRA's  pleading

6   requirements.  (SAC ¶¶ 227-228.)  "In the Ninth Circuit, 'to be liable as a primary

7   violator of § 10(b) for participation in a 'scheme to defraud,' the defendant must

8   have engaged in conduct that had the principal purpose and effect of creating a false

9   appearance of fact in furtherance of the scheme." (*See* Order, Doc. No.  51, at 22)

10  (quoting *Simpson v. AOL Time Warner*, 452 F.3d 1040, 1048 (9th Cir. 2006)).

11  Furthermore,  "[i]t  is  not  enough  that  a  *transaction*  in  which  a  defendant  was

12  involved  had  a  deceptive  purpose  and  effect;  the  defendant's  *own conduct*

13  contributing  to  the  transaction  and  overall  scheme  must  have  had  a  deceptive

14  purpose and effect."  *Simpson*, 452 F.3d at 1048 (emphasis in original);  *In re*

15  *Hansen Natural Corp. Sec. Litig.*, 2007 WL 3244646, at *11 ("Plaintiff's failure to

16  plead any facts related to the role or knowledge of any of the Officer Defendants or

17  any Individual Defendant's involvement in the alleged backdating scheme is fatal to

18  Plaintiff's showing of scienter both with respect to the Officer Defendants and with

19  respect to [the Company]").

20       Here, scheme liability turns on "whether each 10b-5 Defendant's conduct

21  had  'the  principal   purpose  and  effect  of  creating  a  false  appearance  of  fact  in

22  furtherance of the scheme.'" (Order, Doc. No.  51, at 22.)  Plaintiff cannot base its

23  scheme allegations on the granting of misdated options and subsequent incorrect

24  financial statements.  There can be no dispute that signing financials and granting

25  stock options are ordinary, legitimate business transactions.  Yet, the SAC contains

26  no  well-pled  facts  showing  that  the  Defendants'  "purpose"  in  accounting  for

27  Quest's "bucket and best price" methodology was to defraud shareholders.  Plainly,

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

22          Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)

1   the alleged improper accounting for the mispriced options does not transform

2   Defendants' conduct into a scheme.  *See Simpson*, 452 F.3d at 1053.

3   **VII.   THE SECTION 20(a) CLAIMS SHOULD BE DISMISSED**

4       Plaintiff asserts a "control person" liability claim against the Officer

5   Defendants under §20(a) of the 1934 Act, 15 U.S.C. §78t(a).  "To state a claim

6   under Section 20(a), a plaintiff must allege (1) a primary violation of federal

7   securities laws; and (2) that the defendant exercised actual power or control over

8   the primary violator."  *In re Hansen Natural Corp. Sec. Litig.*, 2007 WL 3244646,

9   at *11.

10      Because Plaintiff fails to state a cognizable Rule 10b-5 claim against any

11  defendant, §20(a) claims must be dismissed.  *See In re Copper Mountain Sec.*

12  *Litig.*, 311 F. Supp. 2d 857, 883 (N.D. Cal. 2004).  Given that Plaintiff has not

13  plead with particularity a "primary violator," it does not and cannot plead control of

14  a "primary violator."

15      The control person allegations against Mr. Lambert also fail because Plaintiff

16  does not allege that Mr. Lambert controlled a primary violator at the time of the

17  alleged wrongdoing.  The SEC defines control as "the possession, direct or indirect,

18  of the power to direct or cause the direction of the management and policies of a

19  person, whether through ownership of voting securities, by contract, or otherwise."

20  17 C.F.R. § 230.405.  Mr. Lambert joined Quest in November 2004 – over two

21  years after Quest stopped using the "bucket and best price" methodology.  (SAC ¶¶

22  33, 175.)  Mr. Lambert had no control over the "management and policies" used in

23  1999 – 2002, which is when the grant dates at issue were set for accounting

24  purposes.  Thus, unlike the §20(a) defendant in *Howard v. Everex Sys., Inc.,* Mr.

25  Lambert could not have controlled the "transactions" (i.e. the initial decision not to

26  take a compensation charge) "giving rise to the alleged securities violation."  228

27  F.3d 1057, 1065 (9th Cir. 2000).  This temporal disconnect gives rise to more than

28  just an affirmative defense; it shows that the §20(a) claim against Lambert is too

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

23

**Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)**

speculative to even survive under Rule 8. *See Bell Atlantic Corp.*, 127 S. Ct. at 1965 (to survive a Rule 12(b)(6) motion a complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level.")[14] Thus, the §20(a) claim against Lambert and the remaining Defendants should be dismissed.

## VIII. PLAINTIFF HAS NOT STATED A §20(A) CLAIM FOR INSIDER TRADING

Plaintiff does not even attempt to allege that Mr. Garn violated §10(b) or §20(a). (*See* Count I and II in SAC.)  Thus, the §20A claim against him must be dismissed.  *See In re VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1488 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993) ("A careful parsing of the somewhat tangled initial sentence of [Section] 20A discloses that an insider – one who trades while in the possession of material, nonpublic information – is liable only where an independent violation of another provision of the securities laws has occurred.")

The Court should also dismiss the §20A claim against the remaining Defendants because Plaintiff has not adequately pled the predicate violation of the securities laws against those Defendants.  *See id.*; *see also In re Connetics Corp. Sec. Litig.*, No. C 07-02940 SI, 2008 WL 269467, at *14 (N.D. Cal. Jan. 29, 2008). This claim further fails because Plaintiff does not allege insider trading with particularity and lacks standing to bring a claim for insider trading.[15]

---

[14] Moreover, affirmative defenses may be addressed in a motion to dismiss when they are established on the face of the complaint. *See Jablon v. Dean Witter*, 614 F.2d 677, 682 (9th Cir. 1980) (affirming dismissal of federal securities claim because allegations of complaint established affirmative defense of statute of limitations).

[15] Specifically, the SAC fails to allege with particularity that Plaintiff traded "contemporaneously with" any insider. *See Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir. 1993).  Numerous courts have held that "contemporaneous trading" requires Plaintiff asserting a §20A claim to have traded on the same day as defendants. *See In re AST Research Sec. Litig.*, 887 F. Supp. 231, 233 (C.D. Cal. 1995); *Buban v. O'Brien*, No. C 94-0331 FMS, 1994 WL 324093, at *7 (N.D. Cal. June 22, 1994).  According to Plaintiff's Certification filed with its initial complaint, Mr. Smith was the only Defendant who sold stock on the day Plaintiff allegedly purchased stock.  Plaintiff fails to allege facts showing that Mr. Smith was aware that Quest's non-cash compensation was understated in October 2004.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

**Defs.' Mem. of P. & A.  ISO of MTD SAC
CV06-6863 DOC (RNB)**

1

2    Dated: February 26, 2008              COOLEY GODWARD KRONISH LLP
                                           KOJI F. FUKUMURA (189719)
3                                          AARON F. OLSEN (224947)

4

5                                          /s/ Koji F. Fukumura
                                           Koji F. Fukumura
6
                                           Attorneys for Defendants
7                                          Quest Software, Inc., Vincent C. Smith,
                                           Michael J. Lambert, Douglas F. Garn,
8                                          David M. Doyle, and Kevin Brooks

9
     575733 /SD
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
     Plaintiff further fails to allege that Mr. Smith traded on the basis of that
27   information.  Accordingly, because Plaintiff fails to satisfy the "contemporaneous
     trading" requirement, the SAC's insider trading claims should be dismissed as to all
28   Defendants.