COOLEY GODWARD KRONISH LLP
KOJI F. FUKUMURA (189719)
(kfukumura@cooley.com)
AARON F. OLSEN (224947)
(aolsen@cooley.com)
4401 Eastgate Mall
San Diego, CA  92121
Telephone:(858) 550-6000
Facsimile:(858) 550-6420

Attorneys for Defendants
Quest Software, Inc.,
Vincent C. Smith, Michael J. Lambert,
Douglas F. Garn, David M. Doyle,
and Kevin Brooks

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT

## SOUTHERN DIVISION

| | |
|---|---|
| MIDDLESEX RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>QUEST SOFTWARE, INC., VINCENT C. SMITH, M. BRINKLEY MORSE, MICHAEL J. LAMBERT, DOUGLAS F. GARN, DAVID M. DOYLE, JERRY MURDOCK, JR., and KEVIN BROOKS,<br><br>Defendants. | Case No. CV06-6863 DOC (RNB)<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>DATE:    May 12, 2008<br>TIME:    8:30 A.M.<br>CTRM:   9D<br>JUDGE:  Hon. David O. Carter |

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................. 1

II.   ARGUMENT ........................................................................................ 2

   A.   Knowledge That Stock Options Were Granted Pursuant to the "Bucket and Best-Price" Method is Insufficient to Establish Scienter ....................................................................................... 2

   B.   The Opposition Confirms That The SAC Fails to Allege a Violation of the 1999 Plan ................................................................. 6

   C.   Application of APB No. 25 Is Complex, Not "Unambiguous," and Failure to Follow It Cannot Establish Scienter ......................... 9

   D.   Plaintiff's Remaining Contentions Fail to Establish A Strong Inference of Scienter ................................................................. 12

      1.   Insider Sales Are Insufficient Show Scienter ...................... 12

      2.   The Size of Restatement and GAAP Violations Are Insufficient to Scienter. ......................................................... 12

      3.   Receipt of Misdated Stock Options is Insufficient to Scienter ................................................................................. 13

      4.   Government Investigations Are Insufficient to Show Scienter ................................................................................. 14

      5.   Plaintiff's Allegations Concerning the Sarbanes-Oxley Act ("SOX") Are Insufficient to Show Scienter ..................... 15

      6.   Motive And Opportunity Allegations Are Insufficient to Show Scienter ........................................................................ 16

      7.   Departure of Morse Is Insufficient to Show Scienter .......... 17

      8.   Inability to Locate Select Documents in the Course of the Special Committee's Investigation is Insufficient to Show Scienter ........................................................................ 17

   E.   The Failure to Allege a Primary Violation Mandates Dismissal of the Insider Trading and Control Person Claims ......................... 18

   F.   Plaintiff Fails To Allege A "Scheme" ........................................... 19

III.  CONCLUSION .................................................................................... 19

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES

**Page**

CASES

*City of Austin Police Ret. Sys. v. ITT Educ. Serv.*, Inc.,
388 F.Supp.2d 932, 942 (S.D. Ind. 2005) .......................................................... 15

*DSAM Global Value Fund v. Altris Software*,
288 F.3d 385 (9th Cir. 2002) ................................................................ 13, 17

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
No. 8:06-cv-0716-T-23EAJ, slip op., 2008 WL 977357, at \*14-\*19
(M.D. Fla. Apr. 9, 2008) .................................................................. 3, 4, 5

*Gompper v. VISX, Inc.*,
298 F.3d 893, 895-96 (9th Cir. 2002) ............................................................ 6

*In re Ceridian Corp. Sec. Litig.*,
504 F.Supp.2d 603, 619  (D. Minn. 2007) .......................................................... 15

*In re CNET Networks, Inc.*,
483 F. Supp. 2d 947, 955 (N. D. Cal. 2007) ...................................................... 10

*In re Connetics Corp. Sec. Litig.*,
2008 WL 269467 (N.D. Cal. Jan. 29, 2008) ...................................................... 15

*In re Copper Mountain Sec. Litig.*,
311 F. Supp. 2d 857 (N.D. Cal. 2004) ....................................................... 6,13, 19

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
355 F. Supp. 2d 1069 (N.D. Cal. 2005) ........................................................ 13

*In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp.2d 1142, 1157
(C.D. Cal. 2007) ......................................................................... 3

*In re ICN Pharmaceuticals, Inc. Sec. Litig.*,
299 F. Supp. 2d 1055 (C.D. Cal. 2004) ...................................................... 7, 13, 16

*In re Openwave Systems Sec. Litig.*,
528 F. Supp. 2d 236, 249 (S.D.N.Y. 2007) ........................................................ 3

*In re Silicon Graphics, Inc. Sec. Litig.*,
183 F.3d 970 (9th. Cir. 1999) ................................................................. 16

*In re Sportsline.com Sec. Litig.*,
366 F. Supp. 2d 1159 (S.D. Fla. 2004) ...................................................... 10, 14

*In Re US Aggregates, Inc. Sec. Litig.*,
235 F. Supp. 2d 1063 (N.D. Cal. 2002) ........................................................ 13

*In re Vantive Corp. Sec. Litig.*,
at 1090-91 ............................................................................... 13

*In re Witness Systems, Inc. Sec. Litig.*, No. 1:06-CV-1894, slip op., at
13-14 (N.D. Ga. Mar. 31, 2008) .......................................................... 3, 4, 10, 11

*Mesko v. Cabletron Sys., Inc.*,
311 F.3d 11, 39 (1st Cir. 2002) .............................................................. 17

*Ronconi v. Larkin*,
253 F.3d 423, 435 (9th Cir. 2001) ............................................................ 12

1

2

# TABLE OF AUTHORITIES
## (continued)

Page

*Rudolph v. UTStarcom, et al.*,
   No. C 07-04578 SI., slip op., 2008 WL 1734763, at *5-*8 (N.D.
   Cal. Apr. 14, 2008).................................................................... 3, 4, 5, 6, 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. ___, 127 S. Ct. 2499, 2504 (2007) ........................................ 16, 17, 18

*United States v. Reyes*,
   2007 WL 1574540, *3 (N.D. Cal. May 30, 2007) ........................................ 9, 11

*United States v. Shanahan*,
   2008 U.S. Dist. LEXIS 29868, at *19 (D. Mo. Mar. 31, 2008)........................ 10

*Weiss v. Amkor Tech., Inc.*,
   527 F. Supp 2d 938, 949 (D. Ariz. 2007)................................................ 3, 10, 13

## STATUTES

15 U.S.C. §78-4(b)(3)(C) ........................................................................... 18

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii.

**Defs.' Mem. of P. & A.  ISO of MTD SAC**
**CV06-6863 DOC (RNB)**

## I.    INTRODUCTION

The Opposition is revealing of Plaintiff's theory of fraud in this case.  With respect to scienter, Plaintiff maintains that mere knowledge that stock option grant dates were selected pursuant to Quest's "bucket and best price" methodology equates to: (i) knowledge of the relevant accounting rules (i.e. Accounting Principles Board Opinion ("APB") No. 25); (ii) an understanding of how to determine an accounting "measurement date" under APB 25 and the accounting consequences that flow from a difference between a "measurement" date and a "grant" date;  and (iii) knowledge that financial statements were materially misstated as a consequence of (i) and (ii).  (*See* Plaintiff's Mem. of P&A's ISO Opposition ("Opp."), Doc. No. 103, at 10-12.)  This theory, however, rests on a number of fundamental misconceptions.  First, the SAC mistakenly characterizes the option grants as being improper, while it is actually the accounting for the option grants that raises issues.[1]  Additionally, both recent authority and established Ninth Circuit precedent make clear that Plaintiff **may not conflate** knowledge that the Company used a particular methodology to grant options with guilty knowledge of those three separate sets of facts.

In addition, the Opp. confirms that the SAC fails to establish scienter for the following principal reasons:

*First*, the Opp. confirms that the SAC fails to allege adequately a violation of the 1999 Stock Incentive Plan ("1999 Plan").  The Opp. fails to show that the selection of exercise prices pursuant to the "bucket and best price" methodology violated the 1999 Plan.  The 1999 Plan allows Quest to grant two different types of stock options – Non-Statutory Stock Options ("NSOs"), and Statutory Tax Qualified Incentive Stock Options ("Tax Qualified Options").  It is critical to note

---

[1]  There is no limitation under the 1999 Plan, or under generally accepted accounting principles, with issuing a backdated option.  There may be, however, an accounting implication.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

Defs.' Reply  ISO MTD SAC
CV06-6863 DOC (RNB)                                    1

1  that under the terms of the 1999 Plan, only Tax Qualified Options were subject to a

2  limitation that option grants must be at a price equal to fair market value.

3  Furthermore, as Plaintiff admits in the Opp., Quest granted exclusively NSOs.[2]

4  Accordingly, these allegations do not show a violation of the 1999 Plan and do not

5  support a strong inference of scienter.

6    *Second*, although the Opp. argues that APB No. 25 is simple and not subject

7  to varied interpretation, substantial authority, including a Letter from the Office of

8  the Chief Accountant of the SEC,[3] concluded precisely the opposite.  At the very

9  least, these authorities show APB No. 25, and its application to the facts and

10  circumstances here, is **not** "unambiguous," as Plaintiff urges.  As such, the fact that

11  Quest's employees failed to apply APB No. 25 properly does not (and cannot) show

12  scienter.

13    *Finally*, the Opp. confirms that Plaintiff's remaining allegations are

14  insufficient – whether standing alone or taken together.

15  **II.** **ARGUMENT**

16    **A.** **Knowledge That Stock Options Were Granted Pursuant to the**

17     **"Bucket and Best-Price" Method is Insufficient to Establish Scienter**

18    Contrary to Plaintiff's contentions, knowledge of the so-called "intentional

19  backdating" does not amount to securities fraud.  (*See* Opp., Doc. No. 103, at 10-

20  12.)   The SAC, and the Opp., confuse the concept of backdating with the

21  accounting treatment for the transaction.  In this case, knowledge that stock option

22  grants were assigned pursuant to a flawed methodology (we have coined the term

23  "bucket and best price"[4] method to describe the method Quest used)[5] does not – as a

---

[2]  With the exception of grants to two individuals since the inception of the 1999 Plan.

[3]  Letter dated September 19, 2006 from the Chief Accountant of the SEC ("OCA Letter"), App. Ex. E.

[4]  Plaintiff takes issue with the term "bucket and best price" methodology. (See Opp., Doc. No. 103, at 4, n.8.)  This is a shorthand term we use to describe the practice at Quest where, starting in 1999, the Company typically dated new hire and merit stock option grants to employees on a monthly basis. (*See* App., Ex. B

2

**Defs.' Reply ISO MTD SAC**
**CV06-6863 DOC (RNB)**

matter of law – mean that Defendants "knew or were severely reckless in not knowing [that] Quest's financial statements were materially false."[6]   (*See* Opp., Doc. No. 103, at 10); *see also In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp.2d 1142, 1157 (C.D. Cal. 2007); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp 2d 938, 949 (D. Ariz. 2007); *See In re Witness Systems, Inc. Sec. Litig.*, No. 1:06-CV-1894, slip op., at 13-14 (N.D. Ga. Mar. 31, 2008);[7] *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, No. 8:06-cv-0716-T-23EAJ, slip op., 2008 WL 977357, at \*14-\*19 (M.D. Fla. Apr. 9, 2008); *Rudolph v. UTStarcom, et al.*, No. C 07-04578 SI, slip op., 2008 WL 1734763, at \*5-\*8 (N.D. Cal. Apr. 14, 2008).

   Recent decisions confirm that, in pleading scienter, a plaintiff **may not conflate** knowledge that the Company used a particular methodology to grant options with the critical knowledge about the treatment of such actions under  the applicable accounting rules and their effect on the financial statements.   *See*

---

[Quest's 2006 Annual Report, SEC Form 10-K, filed on December 7, 2007], Doc. No. 75-4, at 68.) This method further provided that the grant date for any given new hire would be based on the month during which the new hire signed an employment offer letter or started employment with the Company. (*See id.*) When options were granted to existing employees as merit grants, they were approved using the same practice and included in the monthly new-hire grant procedure.  (*See id.*) Option grants for these grants for a given month were dated as of the trading date during that month on which the closing price for Quest Common Stock reported by Nasdaq was determined to be the lowest monthly closing price, and the exercise price established for those option grants was the closing sale price of the Common Stock on such date. (*See id.*) Quest made annual or broad-based, company-wide grants in 2000, 2001, and 2002 to executive and non-executive employees as of dates determined on the same basis as new hire or merit grants. (*See id.*)

[5] Plaintiff mistakenly contends that Defendants "received options, the exercise or strike prices of which did not match the actual date on which defendants received them. . . ." (*See* Opp., Doc. No. 103, at 11.) (quoting *In re Openwave Systems Sec. Litig.*, 528 F. Supp. 2d 236, 249 (S.D.N.Y. 2007).  In fact, "the exercise price for all stock option grants was typically set at the closing sale price of [Quest's] Common Stock on the original stated grant date." App., Ex. B [Quest's 2006 Annual Report, SEC Form 10-K, filed on December 7, 2007], Doc. No. 75-4, at 68.)

[6] Contrary to Plaintiff's contentions, "the exercise price for all stock option grants was typically set at the closing sale price of our Common Stock on the original stated grant date." App., Ex. B [Quest's 2006 Annual Report, SEC Form 10-K, filed on December 7, 2007], Doc. No. 75-4, at 68.)

[7] A copy of this unreported decision is attached as Ex. G to the Fukumura Decl. for the convenience of the Court.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

3

Defs.' Reply  ISO MTD SAC
CV06-6863 DOC (RNB)

1   *Witness*, slip op., at 13-14; *Jabil Circuit, Inc.*, slip op., 2008 WL 977357, at *14-

2   *19; *UTStarcom*, slip op., 2008 WL 1734763, at *5-*8.

3         In *Witness*, in the context of a very similar securities class action for non-

4   disclosure of alleged stock option backdating, the court rejected this very theory.

5   *See Witness*, slip op., at 12-14.  Notably, both plaintiff's theory of the case and key

6   allegations in *Witness* virtually mirror those here.   Just as here, the plaintiff in

7   *Witness* alleged that Witness Systems, Inc. (a software company):

8
   • granted stock option with grant dates "selected in
9     hindsight" to coincide with the Company's low shares
      prices (*Compare id.* at 6 *with* SAC ¶174) and that
10    Witness' financial statements were, as a result, "false
      and misleading because they improperly accounted for
11    stock options that were backdated in 2000 and 2001."
      (*Id.* at 6; *see* SAC ¶212);
12
13   • was identified in a May 2006 analyst report as one of
      the companies with potentially improper stock option
14    granting practices (*Compare id.* at 7 *with* SAC ¶¶152-
      153);
15
16   • appointed a Special Committee of independent
      directors to investigate the matter (*Compare id.* at 8
17    *with* SAC ¶154);

18   • disclosed, based on its preliminary internal review,
      that it expected to record an additional compensation
19    charge (*Compare id.* at 8 *with* SAC ¶159); and

20   • announced a restatement (Compare *id.* at 9 *with* SAC
      ¶165).
21

22   In addition, the plaintiff in *Witness* alleged that as a result of defendants' corrective

23   disclosures, Witness' share price fell from $18.19 to $12.91 (or approximately

24   29%).  *See id.* at 8; *see also* SAC ¶221 (alleging a "20.10%" loss).

25         The court in *Witness* refused to infer scienter from these allegations of so-

26   called "backdating":

27         Although the CAC is lengthy, the details contained
          therein are simply insufficient to support a strong
28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

4

Defs.' Reply  ISO MTD SAC
CV06-6863 DOC (RNB)

inference of scienter.  Specifically, the allegations are in the nature of a theory that Defendants must have known that the 2004 and 2005 financial were misstated due to backdating that occurred in 2000 and 2001.  *The CAC never explains when, or how, any or all Defendants learned about the details or circumstances pertaining to any backdated option grants.*

[]Moreover, there are no allegations that the Individual Defendants are or were familiar with the accounting principles applicable to stock options, or that they knew that the proper accounting of the 2000 and 2001 options would necessitate a restatement of [certain] financial statements. [] For example, with respect to the Individual Defendants. . . nothing is alleged that would demonstrate that those individuals had any knowledge that disclosures during the Class Period might require future adjustments based on option grants made in 2000 and 2001.

*Witness*, slip op., at 13-14 (emphasis added).

The court's decision in *Jabil* is also instructive.  *See Jabil*, slip op., 2008 WL 977357, at *14-*19.   The court in *Jabil* rejected the plaintiff's theory that "individual defendant[s] 'knew or should have known' that Jabil had issued backdated stock options and had failed to properly account for the options." *Jabil*, slip op., at *14.  The allegations regarding Jabil's stock option granting practices were also substantially similar to those in Quest and Witness.  *Compare Jabil*, at *6-*8 *with* SAC (¶¶152-154;159; 165; 174) *and Witness*, slip op., at 6-9.

Critically, like Quest, Jabil disclosed that their improper accounting for its option granting practices and the resulting corrections to its financial statements were driven by "changes in the Company's understanding of the requirements for identifying appropriate measurement dates for option grants as defined in relevant accounting guidance or errors in interpreting such guidance, and administrative and logistical errors made in effecting the options program." *Id.* at *3.  The court  in *Jabil,* however, decisively refused to infer scienter from these allegations.  *See id.* at *14-*19.  Finally, the court in *UTStarcom* similarly refused to infer scienter from the alleged backdating practices.  *See UTStarcom*, 2008 WL 1734763, at *7-*8

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

5

Defs.' Reply  ISO MTD SAC
CV06-6863 DOC (RNB)

1   (holding that plaintiff failed to plead intent or deliberate recklessness with respect

2   to the alleged backdating).

3        The above-referenced decisions do not present any issues of first impression

4   for this Court with respect to scienter.   Instead, these decisions are entirely

5   consistent with this Circuit's well-established precedent that knowledge of an

6   allegedly undisclosed fact (i.e. such as Quest's use of a "bucket and best price"

7   method) does not equate to knowledge of the *effect* of that fact (i.e. treatment under

8   APB No. 25 resulting in a compensation expense and resulting misstated financial

9   statements).  *See, e.g., Gompper v. VISX, Inc.*, 298 F.3d 893, 895-96 (9th Cir. 2002)

10  (although "the   complaint   adequately   demonstrates   the   defendants   were

11  unquestionably aware of [the] claim against one of their core patents, in the end it

12  fails to demonstrate the link between awareness of the claim and knowledge that the

13  patents were therefore invalid."); *see also In re Copper Mt. Secs. Litig.*, 311 F.

14  Supp. 2d 857, 872 (N.D. Cal. 2004).

15        **B.     The Opposition Confirms That The SAC Fails to Allege a**
          **Violation of the 1999 Plan**
16

17        The Opp. confirms that the SAC fails to establish a violation of the 1999

18  Plan.  The 1999 Plan allows Quest to grant two different types of stock options –

19  NSOs, and Tax Qualified Options.  It is critical to note that under the terms of the

20  1999 Plan, only Tax Qualified Options were subject to a limitation that option

21  grants must be at a price equal to fair market value.  Recognizing that its previous

22  argument – that the 1999 Plan **prohibited** the use of the bucket and best price

23  methodology – was factually incorrect pursuant to the plain language of the 1999

24  Plan,  Plaintiff asserts three new arguments in its place.

25        **First**, Plaintiff appears to argue that because Tax Qualified Options were

26  granted to two individuals in the entire history of the 1999 Plan (since the 1999

27  Plan was put into effect), Defendants must have known that granting option below

28  fair market value violated the 1999 Plan, and thus acted with scienter.  (*See* Opp.,

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

6

Defs.' Reply  ISO MTD SAC
CV06-6863 DOC (RNB)

Doc. No. 103, at 22) (citing Defendants' Reply ISO Motion to Dismiss FAC at 9, n.6.)  Plaintiff's argument is both incorrect and nonsensical.  Neither the SAC nor any of the documents incorporated into it by reference mention the granting of any Tax Qualified Options.   Further, even if the SAC had referenced those Tax Qualified Grants, the Opp. concedes that Plaintiff does not allege: (i) the number of stock options granted to these two individuals, (ii) whether those options were granted below market value, or (iii) whether a restatement – if any – of those Tax Qualified Options materially impacted any prior period financial statement.[8]  (*See* Opp., Doc. No. 103, at 22-23.)   Accordingly, this contention fails to adequately establish a violation of the 1999 Plan sufficient to support an inference of scienter.  *See In re ICN Pharms., Inc.*, 299 F. Supp. 2d 1055, 1064 (C.D. Cal. 2004) ("Plaintiffs have failed both to substantiate that Defendants committed a violation of GAAP and have failed to provide detailed evidence of the contemporaneous decision-making behind the alleged accounting errors that would combine to show the required scienter. Plaintiffs have therefore not pled with particularity as required under *Silicon Graphics* and its progeny.")

**Second,** Plaintiff argues that Defendants violated the 1999 Plan because "option exercise prices were not fixed at the time of the grant date, but were 'all prepared after the selected grant dates and were executed by members of the Board or Compensation Committee at a later time, in some cases as up to three months after the selected grant date.'" (Opp., Doc. No. 103, at 23) (quoting Def. App., Ex. B, [Quest's 2006 Annual Report, SEC Form 10-K, filed on December 7, 2007] at 109).

Plaintiff's interpretation of that language in Quest's 2006 10-K is not only wrong, it is the exact opposite of what Quest actually disclosed.  Option grants were, in fact, fixed at the time of the grant date because they were fixed by way of a

---

[8]  Furthermore, Plaintiff does not dispute that <u>all other</u> stock options granted at Quest were NSOs.  (*See* Opp., Doc. No. 103, at 23.)

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

7

**Defs.' Reply  ISO MTD SAC**
**CV06-6863 DOC (RNB)**

methodology that automatically selected the grant date.  In contrast, as the disclosure states clearly, the "**unanimous written consents were prepared <u>after the selected grant dates</u>** and were executed by members of the Board or Compensation Committee at a later time. . . ." (*Id.*) (Emphasis added.)  The difference is that "unanimous written consents," not "option exercise prices," were prepared and executed later in time.  In other words, the process of obtaining administrative approval of Quest's stock option grants resulted in delays, and as a result of such delays, there was an additional compensation expenses associated with Quest's historical stock option grants.

It is hardly uncommon for Boards to prepare and execute unanimous written consents after selecting stock option grant dates.  In fact, the Chief Accountant of the SEC acknowledged the practical difficulty of contemporaneous execution of required paperwork in connection with stock option grant approval, concluding that:

> in certain instances where a company's facts, circumstances, and pattern of conduct evidence that the terms and recipients of a stock option award were ***determined with finality on an earlier date prior to the completion of all required granting actions*** [i.e. preparation and execution of unanimous written consents], it may be ***appropriate to conclude that a measurement date under [APB No.] 25 occurred prior to the completion of these actions***."[9]

(App., Ex. E [OCA Letter dated September 19, 2006], Doc. No. 75-9, at 264) (emphasis added).  Stock option grant dates, on the other hand, were consistently selected using Quest's "bucket and best price" methodology.  (*See* Doc. No. 74, at 1-2.)

---

[9] Under the guidance promulgated by the Chief Accountant of the SEC, the Special Committee and Quest were each more conservative than necessary in calculating the revised measurement dates for the stock option grants in question.

COOLEY GODWARD KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

8

Defs.' Reply  ISO MTD SAC
CV06-6863 DOC (RNB)

*Third*, Plaintiff argues that "whether or not [Defendants] violated the [1999] Plan," they "intentionally and knowingly" made false statements in the Company's SEC filings that "Quest issued all options at exercise prices equal to 100% of fair market value. . . ." (*See* Opp., Doc. No. 103, at 23.)  The logic of Plaintiff's argument is circular.  Specifically, Plaintiff assumes what it seeks to prove – i.e. that Defendants' misstatements were "intentional[]" and "knowing."  *See id.*  Tellingly, Plaintiff does not even attempt to explain *what* makes Defendants' statements at issue "intentional" or "knowing[]."  *See id.*  The Opp. fails to identify any red flags that could put Defendants on notice that Quest's "bucket and best price" methodology was flawed, did not comply with APB No. 25, and resulted a compensation charge, which, in turn, drove the need for disclosure.  Most importantly, the statement that stock options were priced based on the closing price on the grant date ***is true***.  (*See* App., Ex. B [Quest's 2006 Annual Report, SEC Form 10-K, filed on December 7, 2007], Doc. No. 75-4,  at 68.)  The grant date was selected by the methodology and options were granted based on the closing price on the grant date.  An accounting issue arises when the measurement date is different from the grant date.   Accordingly, Plaintiff's allegations of "knowing false statements" are conclusory and, therefore, insufficient to establish scienter.

## C.   Application of APB No. 25 Is Complex, Not "Unambiguous," and Failure to Follow It Cannot Establish Scienter

The Opp. states that "Defendants either knew what the requirements of APB No. 25 were, or were deliberately reckless in continually representing to the public that they followed the rule if they did not know what it required." (Opp., Doc. No. 103, at 12.)  Further, Plaintiff infers Defendants' guilty state of mind from the fact that "APB No. 25 is not so ambiguous or unclear." (Opp., Doc. No. 103, at 13) (citing *United States v. Reyes*, 2007 WL 1574540, *3 (N.D. Cal. May 30, 2007).

Cooley Godward Kronish LLP
Attorneys At Law
San Diego

9

Defs.' Reply ISO MTD SAC
CV06-6863 DOC (RNB)

To the contrary, numerous federal courts have held (and the OCA Letter confirms) that the identification of **measurement dates**[10] (as opposed to the selection **grant dates**) under APB No. 25 can be anything but "unambiguous." *See Weiss v. Amkor Tech., Inc.*, 527 F. Supp 2d 938, 949 (D. Ariz. 2007) (dismissing stock option backdating case and stating that the "accounting rules at issue, specifically [APB] No. 25, are complex and require accounting expertise and judgment"); *In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1168–69 (S.D. Fla. 2004) (dismissing restatement case involving stock options and stating that the principles of APB No. 25 are "far from obvious."); *United States v. Shanahan*, 2008 U.S. Dist. LEXIS 29868, at *19 (D. Mo. Mar. 31, 2008) (The definition of measurement date under APB No. 25 may be unclear); *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 955 (N. D. Cal. 2007) (same); *Witness*, slip op., at 15-16.

In fact, even the court in *United States v. Reyes* acknowledged that: "the precise timing of a grant is not always easy to discern." *Id.*, 2007 WL 1574540, at *3. Indeed, in light of the uncertainly that arises in the application of APB No. 25 when coupled with numerous administrative and employment-related factors, "on September 19, 2006, the Chief Accountant of the SEC, Conrad Hewitt, issued a letter identifying a few instances where a company could use the wrong measurement date without rising to the level of fraud." *Shanahan*, 2008 U.S. Dist. LEXIS 29868, at *19. The very need for such interpretive guidance, let alone the varied scenarios of selecting measurement dates that the OCA Letter discusses, illustrate the complexity in the practical application of APB No. 25.

Most recently, the court in *Witness* squarely rejected an argument that the accounting under APB 25 was "simplistic" for the purpose of inferring scienter:

> Plaintiff contends that application of relevant accounting, referred to APB Opinion No. 25, is relatively straightforward with respect to calculating the proper

---

[10] It is the identification of a "measurement date" that drives the accounting consequence under APB No. 25.

COOLEY GODWARD KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

**Defs.' Reply ISO MTD SAC**
**CV06-6863 DOC (RNB)**

compensation expense for stock options.  It asserts that this is a simple process of subtracting the exercise price from the fair market value of [the Company's] stock on the measurement date.  However, ***Plaintiff's assertion oversimplifies the application and substance of APB No. 25.  While some of the necessary calculations may be straightforward once the proper measurement date has been determined, the initial determination of the measurement date is not so straightforward***. *See, e.g.,* APB 25.10 (acknowledging that "the measurement date may be later than the date of the grant or award" in certain circumstances); APB 25.11 (setting forth eight different measurement dates)."

*Witness*, at 15-16.

The incorrect "initial determination of the measurement date" (made pursuant to the "bucket and best price" methodology) is precisely what drove the restatement in this case.[11]  Accordingly, as the above-referenced courts expressly held, the application of APB No. 25 for selecting measurement dates can be complex.  At the very least, the above-referenced decisions (and their divergence from the court's opinion in *U.S. v. Reyes*) illustrate that this rule is not unambiguous.[12]  As such, incorrect application of APB No. 25 cannot support a strong inference of scienter.

---

[11]  "The more relevant question here is what facts are alleged to show that any of the Defendants had the requisite knowledge of the impact, under appropriate accounting principles, on the financial statements for 2004 and 2005 of corrections made with respect to options granted in 2000 and 2001."

*Witness*, at 17.  Here, as in *Witness*, the SAC:

"does not set forth particularized allegations that would show how Defendants, at the time the financial results [for relevant periods] were being disseminated during the Class Period, knew that the application of General Accounting Principles would have mandated a restatement of those financial results due to problems in the granting of options [several] years earlier."

*Id.*

[12]  *See* Webster's Online Dictionary, "Unambiguous," defined as "Having or

COOLEY GODWARD KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

**Defs.' Reply ISO MTD SAC**
**CV06-6863 DOC (RNB)**

### D.   Plaintiff's Remaining Contentions Fail to Establish A Strong Inference of Scienter[13]

#### 1.   Insider Sales Are Insufficient Show Scienter

This Court has already determined that stock sales by Defendants in this case "standing alone" are insufficient to establish scienter. (*See* Order, Doc. No. 51, at 22) (holding that "further analysis is required").   Neither the SAC nor the opposition offer any new facts that would cure this deficiency. (*See* Opp., Doc. No. 103, at 23-24.)   Furthermore, the SAC fails to allege that the specific timing of stock sales by any individual Defendant was suspicious.   In addition, the Opp. fails to account for the fact that two of the Defendants, Vincent C. Smith and M. Brinkley Morse, never exercised or sold any stock options during the Class Period. (*See* Opp., Doc. No. 103, at 23-24.)   These factors substantially undermine any inference that the stock trades by Defendants were suspicious.   *See Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001).

#### 2.   The Size of Restatement and GAAP Violations Are Insufficient to Scienter.

Plaintiff concedes that the size of Quest's 2006 restatement was driven by investigative decisions made in 2006. (*See* Opp., Doc. No. 103, at 17.)   Plaintiff appears to suggest, however, that because "accounting errors [were] made. . . between 1999-June 20, 2003," those errors (which were corrected in 2006) somehow show scienter.   Plaintiff is incorrect.   Courts have routinely held that accounting errors (without more) are insufficient to establish scienter.   *See, e.g., DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir.

---

exhibiting a single clearly defined meaning," available at http://www.websters-online-dictionary.org/definition/UNAMBIGUOUS (last visited on Apr. 24, 2008); *Cf. id.* "Ambiguous," defined as "Open to two or more interpretations," available at http://www.websters-online-dictionary.org/definition/AMBIGUOUS   (last   visited on Apr. 24, 2008).

[13] "[P]laintiff's scienter pleading is based on numerous factual allegations," which "cannot support – either alone or taken collectively – an inference of scienter." *UTStarcom*, slip op., 2008 WL 1734763, at *6.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

**Defs.' Reply  ISO MTD SAC**
**CV06-6863 DOC (RNB)**

2002) (alleged violations of GAAP alone will not give rise to a strong inference of scienter); *see also In re Vantive Corp. Sec. Litig.*, at 1090-91 (plaintiff must "allege specific **contemporaneous** conditions known to the defendants that would strongly suggest that the defendants understood" that their accounting was improper when disclosed) (emphasis supplied).[14]

### 3.    Receipt of Misdated Stock Options is Insufficient to Scienter

The Opp. argues that the SAC's allegations that Defendants Smith, Morse, Garn, Doyle and Brooks received "numerous backdated stock option" evidence scienter. (*See* Opp., Doc. No. 103, at 10-11.)  Yet, Plaintiff completely glosses over the fact that these Defendants received stock options pursuant to the "bucket and best price" methodology – the same way as every other employee receiving stock options at Quest at such time.  (*See* Mem. P&A ISO Motion to Dismiss ("MTD"), Doc. No. 72-2, at 14-15).[15]  Accordingly, their receipt of improperly dated options is neither indicative of special treatment nor suspicious.  *See Amkor*, 527 F.Supp.2d at 948-50 (finding that although some options appear to have been backdated, plaintiff failed to allege facts giving rise to a strong inference of scienter); *Hansen*, 527 F. Supp.2d at 1157 ("Plaintiff's failure to plead any facts related to the role or knowledge of any of the Officer Defendants or any Individual Defendant's involvement in the alleged backdating scheme is fatal to Plaintiff's showing of

---

[14] *See also In re ICN Pharmaceuticals, Inc. Sec. Litig.*, 299 F. Supp. 2d 1055, 1065 (C.D. Cal. 2004); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 872 (N.D. Cal. 2004); *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1091 (N.D. Cal 2005) ("In order to distinguish 'deliberate recklessness' from 'ordinary carelessness,' allegations of GAAP violations must be augmented by 'facts that shed light on the mental state' of defendants, rather than conclusory allegations that defendant must have known of the accounting failures due to the degree of departure from established accounting principles."); *In re US Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1073 (N.D. Cal. 2002) ("[E]ven an obvious failure to follow GAAP does not give rise to an inference of scienter.").
[15] Quest consistently applied "bucket and best price" method.  Contrary to Plaintiff's suggestion (*See* Opp., Doc. 103, at 4-5; and 19 at n.33), the "lowest-price-of-the-month" is not inconsistent with the "lowest-price-of-the-quarter" method.  Both were in place to adjust for the volatility in Quest's stock price.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

scienter both with respect to the Officer Defendants and with respect to [the Company]"); *In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1168–69 (S.D. Fla. 2004) (allegations that stock options accounting issues that required restatement of two and a half years of financial statements were insufficient to plead scienter).

Plainly, because Defendants (admittedly) could not know the size of the restatement until 2006, the amount of that restatement cannot be indicative of Defendants' state of mind in years prior to 2006.[16]

### 4. Government Investigations[17] Are Insufficient to Show Scienter

Plaintiff attempts to infer scienter from the fact that Defendants Quest, Smith, Brooks, Morse (and a former Quest employee John Laskey) received "'Wells Notices' from the SEC in connection with its investigation" of Quest. (*See* Opp., Doc. No. 103, at 3.)  Federal courts have consistently held, however, that "[m]ere existence" of an SEC investigation "cannot support any inferences of

---

[16] Plaintiff's opposition argues that the "hypothetical" Defendants used in their brief (*See* Mem. P&A's ISO Motion to Dismiss at 17 (and n.11) "suggests that somehow Quest may have exaggerated the Restatement amount. . . ." (Opp., Doc. No. 103, at 17, n.29.) To be clear, Defendants suggest nothing of the sort.  Instead, Defendants' hypothetical illustrates that the size of the restatement is merely a function of how many options the Special Committee repriced (and at which price), which in turn, is a function of how the Special Committee applied APB No. 25 in ascertaining corrected stock option measurement dates.  Because Defendants could not possibly know (between 1999 and 2003) which revised exercise prices the Special Committee (in 2006) would select (and under APB No. 25 more than one date can serve as the measurement date, *see supra*, at 8-10), the size of the restatement here cannot be used to establish scienter.

[17] Plaintiff cavalierly dismisses the fact that "more than 190 public companies" have been implicated in connection with their stock option granting practices and related accounting, arguing that the other 6000 public companies knew better. (*See* Opp., Doc. No. 103, at 20, n. 35; *see* SAC ¶80.)  Plaintiff's argument misses the mark.  The vast majority of companies facing scrutiny for their stock option granting practices are technology companies, (with highly volatile stock prices) which attempted to implement a stock option granting practice that was fair to new employees at a time when their stock prices fluctuated wildly.  ***In fact, the May 19, 2006 Goldman Sachs report (which the SAC cites, see ¶¶ 152-156; 162; 220) shows that all but three of the peer companies in Quest's coverage group (11 infrastructure software companies) were identified as having potentially improper option granting policies (along with Quest).***  (*See* App. Ex. F, at 2-3.)

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

**Defs.' Reply  ISO MTD SAC
CV06-6863 DOC (RNB)**

wrongdoing or fraudulent scienter on the part of [a] company or its senior management." *Hansen*, 527 F.Supp.2d at 1662 (quoting *City of Austin Police Ret. Sys. v. ITT Educ. Serv.*, Inc., 388 F.Supp.2d 932, 942 (S.D. Ind. 2005); *In re Ceridian Corp. Sec. Litig.*, 504 F.Supp.2d 603, 619  (D. Minn. 2007) ("[A]s nothing has yet come of the SEC's investigation, the mere fact of the investigation does not appreciably add to the evidence supporting an inference of scienter."); *see also In re Connetics Corp. Sec. Litig.*, 2008 WL 269467 (N.D. Cal. Jan. 29, 2008) (granting motion to strike all paragraphs in complaint relying on SEC complaint, except for the paragraph referencing the existence of that complaint where plaintiff's counsel had not conducted independent investigation).

### 5.   Plaintiff's Allegations Concerning the Sarbanes-Oxley Act ("SOX") Are Insufficient to Show Scienter

The Opp. argues that "the fact that Quest 'ceased' backdating options when the passage of SOX became imminent" shows scienter.  (*See* Opp., Doc. No. 103, at 18.)  As an initial matter, Quest stopped using the "bucket and best price" method in May 2002 –  well in advance of the SOX's effective date on August 29, 2002. (*See* Opp., Doc. No. 103, at 18, n.30) (quoting App. Ex. B, Doc. No. 75-4, at 68.)[18]

Furthermore, even assuming *arguendo* that Quest stopped using its "bucket and best price" method in May 2002 due to the passage of SOX (which is a wholly unsupported inference in the SAC), an innocent inference of non-culpable conduct significantly outweighs any competing inferences of scienter.  Specifically, SOX required for the first time that Form 4s disclosing stock option grants be filed within

---

[18]  Plaintiff suggests that because "between May 1, 2002 and June 1, 2003, measurement date exceptions were noted for 45 grants covering 294,750 options, necessitating an additional compensation expense of $278,000," Quest must have continued using its "bucket and best price" methodology beyond May 2002. (*See* Opp., Doc. No. 103, at 18, n.30) (quoting  App. Ex. B, Doc. No. 75-4, at 110). However, nothing in the record or in Quest's disclosures even remotely suggests that those outlier grants were made pursuant to Quest's prior-used methodology. To the contrary, the additional expense of only "$278,000" (compared to approximately $136 million from prior years) shows a lack of a consistent methodology.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

15

**Defs.' Reply  ISO MTD SAC**
**CV06-6863 DOC (RNB)**

1   two days of the grant date. (*See* SAC ¶82.) Thus, a methodology for setting option

2   grant dates that involved any degree of hindsight became unworkable as a practical

3   matter because the new regulations made it impossible to comply with SEC filing

4   deadlines for grant dates more than two days in the past. *See id.* This change in

5   ***reporting time*** does not require one to conclude when or if an accounting charge

6   should have been taken with respect to any previously granted options.

7       In addition, this argument does not shed light on what any particular

8   Defendant knew about the Company's methodology of granting and accounting for

9   stock options prior to SOX, much less whether any Defendant acted with the

10  requisite intent to deceive, manipulate or defraud. Accordingly, this factor does not

11  support an inference of scienter. The Supreme Court's recent decision in *Tellabs*

12  also directed that courts consider "not only inferences urged by the plaintiff . . . but

13  also competing inferences rationally drawn from the facts alleged," *Tellabs, Inc. v.*

14  *Makor Issues & Rights, Ltd.*, 551 U.S. ___, 127 S. Ct. 2499, 2504 (2007). *Tellabs*

15  requires this Court to look at the inferences set forth herein that weigh heavily

16  against Plaintiff's position.

17          **6.    Motive And Opportunity Allegations Are Insufficient to**
               **Show Scienter**
18

19      Plaintiffs persist in their argument that scienter can be inferred because

20  "stock options can be incredibly lucrative to the option recipients, providing a

21  strong motive for Defendants to commit their fraud. . . ." Such allegations of

22  monetary motive, however, are patently insufficient. *See, e.g., In re ICN*

23  *Pharmaceuticals, Inc. Sec. Litig.*, 299 F. Supp. 2d 1055, 1069 (C.D. Cal. 2004)

24  (*citing In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th. Cir. 1999));

25  *In re Pixar*, 450 F. Supp. 2d at 1104 ("Even if Defendants did have a motive to

26

27

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

16

**Defs.' Reply ISO MTD SAC
CV06-6863 DOC (RNB)**

1  commit fraud . . . '[m]ere motive and opportunity is insufficient.'"); *Witness*, slip

2  op., at 21.[19]

3  ### 7.  Departure of Morse Is Insufficient to Show Scienter[20]

4  The Opp. does not even attempt to explain how Morse's departure or "refusal

5  to cooperate with the Special Committee" creates an inference of scienter *as to the*

6  *Defendants*.  (*See* Opp., Doc. No. 103, at 25.)  Nor does Plaintiff attempt to argue

7  that Mr. Morse's resignation was the result of fraudulent, as opposed to negligent,

8  conduct.  *See id.*; *see also DSAM Global Value Fund v. Altris Software*, 288 F.3d

9  385, 391 (9th Cir. 2002) ("Negligence, even gross negligence, does not rise to the

10 level of the nefarious mental state necessary to constitute securities fraud under the

11 PSLRA . . . .").  Accordingly, the circumstances of Mr. Morse's departure do not

12 show scienter.

13 ### 8.  Inability to Locate Select Documents in the Course of the Special Committee's Investigation is Insufficient to Show
14 Scienter

15 Plaintiff argues that because select documentation reflecting when the

16 "required approval" of stock option grants were signed by members of the Board

17 could not be located during the Special Committee's investigation, those documents

18 must have been "destroyed, discarded or never existed in the first place."  (*See*

19 Opp., Doc. No. 103, at 24.)  Plaintiff's contention is entirely conclusory and is not a

20 rational inference that can be drawn from **any** facts in the SAC.  A rational (and

21 more plausible) non-culpable inference is that documentation was simply lost or

22 misplaced, either as a result of innocent lack of oversight or at most—

23 administrative sloppiness.  *See Tellabs*, 127 S. Ct. at 2504 (inferences of culpability

24 must be at least as strong as any other inferences that could be drawn in favor of

25

26 [19]  *See also Mesko v. Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002)
27 ("'[C]atch-all allegations' which merely assert motive and opportunity, without something more, fail to satisfy the PSLRA.")
[20]  Plaintiff's Opp. does not dispute (and therefore, concedes) that reassignment of
28 Kevin Brooks does not evidence scienter.  *See* Opp., *passim*.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

**Defs.' Reply  ISO MTD SAC
CV06-6863 DOC (RNB)**

defendants).   Nor does Plaintiff attempt to find any motive for the supposed "destruction" of such documentation.   After all, Defendants routinely (and openly) signed unanimous written consents *after the fact*.[21]   *See supra*, at 7.   Accordingly, Plaintiff's "spoliation" argument is pure unsupported conjecture.

Plaintiff further argues that because in some cases "lists reflecting stock option grants processed by the Company's stock plan administrator were different than the lists provided to and approved by either the Board or the Compensation committee," Defendants must have engaged in some "nefarious" conduct.   (*See* Opp., Doc. No. 103, at 24-25.)   Once again, a non-culpable inference is much more plausible.   By its terms ("different than… provided and approved'), the above statements implies the documents at issue were not modified by the Board. Subsequent alterations (whether intentional or not) could have been made for a variety of reasons, including: administrative errors, mistakes, sloppiness, addition of new employees to the grant list/buckets, removal of employees form grant lists due to their departure from Quest, and the promotion of employees that entitled them to additional options, etc.   The multitude of such non-culpable explanations far outweighs the unsupported inference of "nefarious" conduct, especially where Defendants are not alleged to have benefited in any way from these "differences." *See Tellabs*, 127 S. Ct. at 2504.

---

[21] Moreover, neither allegations in the SAC nor anything in the record remotely suggest willfulness or even negligence.   *See* 15 U.S.C. §78-4(b)(3)(C) (sanctions available only for "willful violation").

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

18

Defs.' Reply  ISO MTD SAC
CV06-6863 DOC (RNB)

### E.    The Failure to Allege a Primary Violation Mandates Dismissal of the Insider Trading and Control Person Claims [22]

Because Plaintiff fails to state a cognizable Rule 10b-5 claim against any defendant, §20(a) claims must be dismissed.  *See In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 883 (N.D. Cal. 2004).  In addition, with respect to Mr. Lambert, the Opp. fails to explain how Mr. Lambert (who joined Quest two years after it stopped using its "bucket and best price" methodology) controlled a primary violator.  (*See* Opp., Doc. No. 103, at 10, n.19; Opp. to Murdock's MTD, Doc. No. 104, at 22-24; Opp. to Morse's MTD, Doc. No. 105, at 19-21.)  Accordingly, the §20(a) against all Defendants, including Mr. Lambert, must be dismissed.

### F.    Plaintiff Fails To Allege A "Scheme"

Scheme liability in this case turns on "whether each 10b-5 Defendant's conduct had 'the principal  purpose and effect of creating a false appearance of fact in furtherance of the scheme.'"  (Order, Doc. No.  51, at 22.)   The Opp.  fails to show that Defendants' "purpose" in *knowing* about Quest's "bucket and best price," *failing to properly account* for that methodology, and *failing to disclose* it was done "in furtherance" of any scheme.

## III.   CONCLUSION

Because the SAC fails to allege sufficiently a strong inference of scienter, a violation of the 1999 Plan, fails to show a knowing misapplication of APB No. 25, and for all the additional foregoing reasons, Defendants respectfully request that the Court dismiss the SAC.

---

[22]   The Opp. does not dispute that the SAC fails to allege that Mr. Garn violated §10(b) or §20(a). *See* Opp., Doc. No. 103, at 10, n.19; Opp. to Murdock's MTD, Doc. No. 104, at 20-22.) The Court should also dismiss the §20A claim against the remaining Defendants because Plaintiff failed to adequately allege a predicate violation of the securities laws against those Defendants and failed to establish standing.

Cooley Godward Kronish LLP
Attorneys At Law
San Diego

19

Defs.' Reply  ISO MTD SAC
CV06-6863 DOC (RNB)

1    Dated: April 25, 2008                    COOLEY GODWARD KRONISH LLP
                                             KOJI F. FUKUMURA (189719)
2                                            AARON F. OLSEN (224947)

3

4
                                             /s/ Koji F. Fukumura
5                                            Koji F. Fukumura

6                                            Attorneys for Defendants
                                             Quest Software, Inc., Vincent C. Smith,
7                                            Michael J. Lambert, Douglas F. Garn,
                                             David M. Doyle, and Kevin Brooks
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28