UNITED  STATES  DISTRICT  COURT

FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

| | | |
|---|---|---|
| MIDDLESEX RETIREMENT SYSTEM, On behalf of itself and all others similarly situated, | ) ) ) ) | CASE NO. CV 06-6863 DOC (RNBx) |
| Plaintiff(s), | ) ) | O R D E R GRANTING LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION |
| v. | ) ) | |
| QUEST SOFTWARE, INC., VINCENT C. SMITH, M. BRINKLEY MORSE, MICHAEL J. LAMBERT, DOUGLAS F. GARN, DAVID M. DOYLE, JERRY MURDOCK, JR., and KEVIN BROOKS, | ) ) ) ) ) ) ) ) | |
| Defendant(s). | ) ) | |

Before the Court is Lead Plaintiff Middlesex Retirement System's ("Lead Plaintiff," "Plaintiff," or "Middlesex") Motion for Class Certification pursuant to Fed. R. Civ. P. 23 (the "Motion"). After considering the moving, opposing and replying papers, as well as the parties' oral argument, the Court hereby GRANTS the Motion for the reasons stated below.

## I.    Background[1]

---

[1]For a more thorough recitation of the facts, *see Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164 (C.D. Cal. 2007) and Doc. No. 123, Order Granting in Part and Denying in Part Motion to Dismiss Second Amended Complaint.

Defendant Quest Software, Inc. ("Quest") develops and sells database management and other software. Individual defendants Smith, Morse, Lambert, Garn, Doyle, Murdock, and Brooks were Quest officers and directors (Quest and individual defendants collectively referred to as "Defendants"). Lead Plaintiff Middlesex, a Massachusetts pension fund, alleges (and Quest concedes) that Quest knowingly backdated stock options given to employees pursuant to what Quest calls its "bucket and best price" methodology. Middlesex claims that this policy caused Quest's financial statements to be materially misleading because they failed to accurately reflect Quest's compensation expenses. Quest ultimately restated its financials to reflect additional compensation expenses of nearly $150 million. As a result, Lead Plaintiff contends that it (and members of the putative class) purchased Quest stock at prices that were artificially inflated.

According to Plaintiff, Quest's "bucket and best price" methodology violated both Generally Accepted Accounting Principles ("GAAP") and Quest's 1999 Stock Incentive Plan (the "1999 Plan"). However, Quest repeatedly asserted in public filings that its option granting procedures complied with GAAP and that it granted options at prices consistent with the 1999 Plan. Plaintiff further alleges that many of the individual defendants were directly responsible for these and other false SEC filings. In addition, many of the individual defendants received backdated options and were able to make significant profits by then selling those stocks during the relevant time period.

In a 2006 report, Goldman Sachs suggested that Quest's option grant dates were suspicious. Though Quest initially denied any backdating, it set up a Special Committee to investigate its option granting procedures. The Special Committee ultimately found substantial backdating. Middlesex then instigated the instant litigation on October 27, 2006. Middlesex charges a number of the defendants with committing securities fraud in violation of § 10(b) of the Securities and Exchange Act of 1934 ("Section 10(b)") and Securities and Exchange Commission Rule 10b-5 thereunder ("Rule 10b-5"). It further charges that numerous individual defendants are liable as control persons under § 20(a) of that Act. Finally, Middlesex alleges that certain of the individual defendants engaged in insider trading under § 20A of the Act.

1    Middlesex has already survived two motions to dismiss.  It filed the instant Motion for

2    Class Certification on June 12, 2009.  Previously, on January 22, 2007, this Court signed a

3    stipulation and order appointing Middlesex as Lead Plaintiff and approving Wolf Popper LLP

4    ("Wolf Popper") as Lead Counsel for the plaintiff class as well as Hulett Harper Stewart LLP

5    ("Hulett") as Liaison Counsel, pending certification.  *See* Doc. No. 19.

6    **II.    Legal Standard**

7        Federal Rule of Civil Procedure 23 governs class actions.  FED. R. CIV. P. 23.  A party

8    seeking class certification must demonstrate the following prerequisites: "(1) numerosity of

9    plaintiffs; (2) common questions of law or fact predominate; (3) the named plaintiff's claims and

10   defenses are typical; and (4) the named plaintiff can adequately protect the interests of the class."

11   *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citing FED. R. CIV. P. 23(a)).

12   A district court must engage in a "rigorous analysis" to determine whether the party seeking

13   certification has met the prerequisites of Rule 23(a).  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d

14   1227, 1233 (9th Cir. 1996) (*quoting In re Am. Med. Sys.*,75 F.3d 1069, 1079 (6th Cir. 1996)).

15   The party may not rest on mere allegations, but must provide facts to satisfy these requirements.

16   *Doninger v. Pac. Northwest Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977).

17       After satisfying the four prerequisites of numerosity, commonality, typicality, and

18   adequacy, a party must also demonstrate either: (1) a risk that separate actions would create

19   incompatible standards of conduct for the defendant or prejudice individual class members not

20   parties to the action; or (2) the defendant has treated the members of the class as a class, making

21   appropriate injunctive or declaratory relief with respect to the class as a whole; or (3) common

22   questions of law or fact predominate over questions affecting individual members and that a

23   class action is a superior method for fairly and efficiently adjudicating the action.  FED. R. CIV.

24   P. 23(b).

25       The decision to grant or deny a motion for class certification is committed to the trial

26   court's broad discretion.  *E.g., Yamamoto v. Omiya*, 564 F.2d 1319, 1325 (9th Cir. 1977).

27   Furthermore, "[i]n making a class determination in a securities case, the requirements of Rule 23

28   should be liberally construed in recognition of the rule's policy in favor of class actions."

1  *Schwartz v. Harp*, 108 F.R.D. 279, 281 (C.D. Cal. 1985) (citing *Blackie v. Barrack*, 524 F.2d

2  891, 903 (9th Cir. 1975).  In determining whether a plaintiff has satisfied the requirements of

3  Rule 23, a court may not inquire into whether the plaintiff will prevail on the merits of the case.

4  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78, 94 S. Ct. 2410 (1974).  However, while a

5  court must accept the substantive allegations in the complaint as true, *In re Coordinated Pretrial*

6  *Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1342 (9th Cir. 1982), in some

7  cases it may be necessary for the court to look beyond the pleadings to determine whether the

8  plaintiff has satisfied the certification requirements.  *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S.

9  147, 160, 102 S. Ct. 2364 (1982).

10  **III.    Discussion**

11      Plaintiff moves to certify the following class:

12          All persons and entities who purchased Quest Software, Inc.

13          ("Quest") common stock during the period November 9, 2001

14          through July 3, 2006, inclusively (the "Class Period") and who were

15          damaged thereby (the "Class"); excluding (i) Defendants; (ii)

16          directors and officers of Quest; (iii) subsidiaries and affiliates of

17          Quest; (iv) members of the immediate families of each of the

18          individual Defendants and Quest's officers and directors; (v) any

19          entity in which any Defendant has a controlling interest; and (vi) the

20          legal representatives, heirs, successors and assigns of any such

21          excluded person.

22      Plaintiff also seeks to have the Court certify it as representative of the above described

23  class and Lead Counsel Wolf Popper confirmed as Class Counsel, as well as Hulett confirmed as

24  Liaison Counsel.  Plaintiff asserts that it has satisfied the prerequisites of Rule 23(a) and the

25  additional predominance and superiority requirements of Rule 23(b)(3).  Defendants oppose

26  class certification, raising three main arguments.  First, Defendants contend that Middlesex does

27  not have standing to sue under Section 10(b) and Rule 10b-5 because Middlesex does not qualify

28  as a "purchaser" of securities.  Second, Defendants argue that Middlesex's claims are atypical

1  because it will be subject to unique defenses.  Third, Defendants aver that Middlesex's allegedly

2  inappropriate relationship with its counsel as well as its lack of investment-related diligence

3  render it inadequate.

4              **A.**       **Standing**

5        An entity lacks standing to bring a private damages action under Section 10(b) or Rule

6  10b-5 if it does not qualify as a "purchaser' or "seller" of securities as defined by the Securities

7  and Exchange Act of 1934.  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 754-55, 95

8  S. Ct. 1917 (1975).  Without standing, Lead Plaintiff cannot seek to represent the instant class.

9  *See O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S. Ct. 669 (1974) ("[I]f none of the named

10  plaintiffs purporting to represent a class establishes a requisite of a case or controversy with the

11  defendant, none may seek relief on behalf of herself or himself or any other member of the

12  class.").

13        Despite two previous motions to dismiss, Defendants raise for the first time in opposition

14  to the instant Motion that Plaintiff lacks standing to sue because it does not qualify as a

15  "purchaser" of securities under applicable law.  Specifically, Defendants contend that an entity

16  cannot properly be considered a purchaser of securities under Section 10(b) when that entity

17  delegates full decision-making authority regarding the purchase of securities to third parties and

18  does not otherwise make relevant investment decisions.  In summary, Defendants aver Plaintiff

19  Middlesex abdicated full decision-making authority with respect to the purchase of Quest stock

20  to one of its fifty investment managers, J. & W. Seligman & Co. Incorporated ("Seligman").

21  Defendants direct the Court to Plaintiff's investment management agreement with Seligman that

22  states, in pertinent part,  "Adviser shall have full power to supervise and direct investment and

23  reinvestment of the Account, all without prior consultation with Client, in accordance with the

24  investment objectives, guidelines and restrictions set forth in Exhibit B."  *See* Declaration of

25  Ryan E. Blair in Supp. of Defs.'s Opp. ("Blair Decl."), Exh. C at 43.  In addition, Defendants

26  contend that Middlesex had no part in setting the guidelines circumscribing Seligman's

27  authority, but again, instead relied on its third-party investment consultant, Wainwright

28  Investment Counsel, LLC ("Wainwright").

Furthermore, Defendants contend that the deposition testimony of Thomas Gibson ("Gibson"), Middlesex's Fed. R. Civ. P. 30(b)(6) designee, demonstrates that Middlesex was wholly unaware of Seligman's purchase of Quest stock until Wolf Popper recommended instigating the present litigation, and further confirms that Middlesex repeatedly failed to monitor Seligman's investments by relying solely on Wainwright and failing also to consult with Wainwright. For example, Defendants allege that Gibson's testimony confirms that while Middlesex seemingly required Seligman to provide bi-weekly performance reports and minutes of monthly portfolio meetings, there is no evidence suggesting Middlesex ever received such updates. In addition, though Gibson testified that investment managers such as Seligman were required to meet annually with Middlesex, Defendants contend that Middlesex has no documentation demonstrating that Seligman communicated with the Board with respect to Seligman's purchase of Quest stock. Furthermore, while Middlesex acknowledged that its agreement with Seligman required Seligman to make bi-annual presentations to the Board, Defendants contend that such presentations never took place. Finally, while Middlesex employed Wainwright to aid in the monitoring of Seligman, the record allegedly supports that Middlesex also completely failed to check-in with Waingwright and verify its activity. Thus, Defendants essentially allege that Middlesex could not have been more in the dark regarding its investment with Quest.

Upon making such factual assertions, Defendants concede that the Ninth Circuit has not addressed whether an institutional investor that uses the services of an investment advisor lacks standing to sue for violations of Section 10(b) and Rule 10b-5. As a result, Defendants primarily rely on *Congregation of the Passion, Holly Cross Province v. Kidder Peabody & Co., Inc.*, 800 F.2d 177 (7th Cir. 1986), (and other non-binding authority outside this District), in support of their position. In *Congregation*, plaintiff (a religious organization) entrusted its investment manager with millions of dollars to manage. The plaintiff also gave the manager "full discretion to develop and implement a prudent portfolio strategy[.]" *Id.* at 178-79. The advisor then placed high-risk orders with over thirty securities dealers who executed transactions and never directly offered investment advice to plaintiff. *Id.* at 179. The investment manager ultimately depleted

1   the funds, and plaintiff sued both the investment manager and dealers for violation of Section

2   10(b).  *Id*. at 180.

3        The Seventh Circuit ruled that the plaintiff could not sue its investment manager and

4   dealers for violation of securities laws where it transferred to its manager "full authority to make

5   investment decisions" and otherwise did not approve any investment transactions or participate

6   in the decision-making process; such abdication of control undermined any assertion that

7   plaintiff qualified as a purchaser of securities.  *Id*. at 181.  Furthermore, the *Congregation* Court

8   reasoned that "an extension of the federal regulation [i.e. Section 10(b) and Rule 10b-5] [to the

9   instant relationship] 'would overlap and quite possibly interfere' with traditional state common

10  law governance of such fiduciary relationships."  *Id*. (*quoting Santa Fe Indus., Inc. v. Green*, 430

11  U.S. 462, 479, 972 S. Ct. 1292 (1977).

12       Some district courts have read *Congregation* to mean that an institutional investor never

13  has standing to sue as a purchaser when it wholly relies on a manager to make investment

14  decisions.  *See Medline Indus. Inc., v. Blunt, Ellis & Loewi, Inc.*, No. 89 C 4851, 1993 WL

15  13436, *2 (N.D. Ill. Jan 21, 1993) (relied on by the instant Defendants and citing *Congregation*

16  for proposition that "[i]nvestors who only passively participate in an investment by transferring

17  full authority to make purchase decisions to an agent are not purchasers [for purposes of Section

18  10(b) and Rule 10b-5.]").  Other courts have either distinguished *Congregation* on its facts or

19  otherwise found it inapplicable precedent.  The Court takes the latter course.

20       First, *Congregation* is not binding precedent, and district courts within the Ninth Circuit

21  have not consistently found its reasoning persuasive.  *See, e.g.*, *In re VeriSign, Inc.*, No. C 02-

22  02270 JW(PVT), 2005 WL 88969, *1, *7 (N.D. Cal. Jan. 13, 2005) ("Notably, Defendants do

23  not cite any authority from this District or the Ninth Circuit to support their claim that 'entities

24  that entirely abdicate their investment decisions to third-parties...cannot bring federal securities

25  claims because they do not have standing as purchasers or sellers.").  Instead, courts have found

26  commonplace a scenario in which an investor relies on the purchase decisions of either a

27  stockbroker or investment manager and have not found such a fact reason alone to deny class

28  certification.  *Id*. at *7.

7

1    In addition, *Congregation* appears to be primarily concerned with the relationship

2  between an investor and its investment manager, rather than with a situation in which an investor

3  seeks to sue the issuer of stock, as is the case here.  As a one New York district court has put it:

4         Applying *Congregation* to the facts of this case would strip

5         plaintiffs of one of their most powerful legal remedies in a manner

6         that seems inconsistent with fundamental laws of agency.  Section

7         10(b) was enacted to address precisely the type of claims asserted by

8         these plaintiffs and it makes little sense that these plaintiffs should be

9         deprived of a cause of action under Section 10(b) simply because an

10        agent acted on their behalf.

11  *Vannest v. Sage, Rutty & Co., Inc.*, 991 F. Supp. 155, 160 (W.D.N.Y. 1997).  Indeed, the

12  *Vannest* Court acknowledged that other district courts have cited *Congregation* for the more

13  limited principle that an investor, as a principal, cannot sue his agent pursuant to Section 10(b).

14  This Court agrees with the reasoning set forth in *Vannest* that *Congregation* should be limited to

15  its particular factual situation, as a more expansive reading appears to undermine the purpose of

16  Section 10(b).  Thus, *Congregation* is directed to a relationship not implicated by the current

17  factual scenario.

18        The Court recognizes that Defendants do not contend that any time an institutional

19  investor relies on an investment manager, the entity lacks standing, but instead limit their

20  position to scenarios in which they contend *all* decision-making authority is relinquished.

21  However, the Court briefly notes that Defendants' heightened focus on the use of an investment

22  manager stands in at least some tension with the Private Securities Litigation Reform Act's

23  ("PSLRA"), 15 U.S.C. §§ 78u-4, noted purpose to encourage "institutional investors to oversee

24  securities cases."  *In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. 563, 567 (N.D. Ill. 2004).

25  Indeed, institutional investors such as pension funds necessarily rely on investment managers

26  and not seeking such professional guidance likely constitutes]a breach of fiduciary duties.  *Id.*;

27  *see also In re Vicuron Pharms., Inc. Sec. Litig.*, 233 F.R.D. 421, 427 (E.D. Pa. 2006).  This

28  stated policy goal of the PSLRA also militates against an overly expansive reading of

*Congregation.*

Finally, even if Plaintiff must demonstrate at least *de minimus* involvement in the investment process and oversight of Seligman, Plaintiff presents such facts here (Defendants' assertions notwithstanding). For example, Plaintiff points to the same deposition testimony of Gibson to demonstrate that Plaintiff did in fact exercise control over Seligman, and may have known about the investment in Quest prior to Wolf Popper's litigation advice. Furthermore, Seligman's investment authority was in fact limited by a set of investment guidelines propounded and signed by Plaintiff. *See* Blair Decl., Exh C at 53-63; *Cox v. Eichler*, 765 F. Supp. 601, 608 n.3 (N.D. Cal. 1990) (distinguishing *Congregation* where plaintiff "set forth specific guidelines and gave express instructions on the permissible scope of investments."). In addition, Defendants provide the Court with no authority suggesting that because Plaintiff utilized an outside consultant, Wainwright, to aid Plaintiff in establishing guidelines, such activity should not constitute an exercise of control *by Plaintiff* over its investment. The deposition testimony of Gibson also supports that Seligman did in fact provide quarterly reports to Plaintiff and Wainwright, one of which is attached as Exhibit D to the Reply Declaration of Patricia I. Avery ("Avery Decl."), and otherwise met with Plaintiff to discuss its investments. Thus, express or implied assertions that Plaintiff was in no way monitoring Seligman is unsupported by the record. Indeed, Plaintiff twice placed Seligman on probation for under-performance and ultimately terminated the company. Based on the record before it, the Court finds that Plaintiff has standing to sue has a purchaser of securities under applicable law.

### B.    Numerosity

Lead Plaintiff asserts that the proposed class satisfies Rule 23's first requirement that "the class is so numerous that joinder of all members is impracticable." FED. R. CIV P. 23(a)(1). While the numerosity requirement is satisfied based on the specific facts of each case, it is generally met  where the class size exceeds forty (40) members. In addition, the exact size of the class need not be known as long as common sense and judicial experience warrant the assumption that the class is indeed large. *See Schwartz*, 108 F.R.D. at 281.

Defendants present no argument in opposition to Plaintiff's position that the numerosity

1    requirement is met.  In addition, the Court finds that the proposed class satisfies the numerosity

2    requirement of Rule 23(a)(1).  For example, Defendant Quest had over 100 million shares of

3    common stock outstanding as well as over 60 million shares of common stock trading on the

4    NASDAQ National Market System during the class period.  In addition, it is undisputed that

5    many institutional investors held Quest stock throughout the class period.  Thus, a conservative

6    estimate suggests that the instant class includes thousands of members, rendering joinder

7    unfeasible.  Accordingly, the proposed class satisfies Rule 23(a)'s numerosity requirement..

8                    **C.    Predominance of Common Questions**

9        Lead Plaintiff must next demonstrate that "questions of law or fact common to the class"

10   warrant class treatment.  Fed. R. Civ. P. 23(a)(2).  This commonality requirement is less rigorous

11   than the companion requirement of Rule 23(b)(3).  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011,

12   1019 (9th Cir. 1998); *Local Joint Exec. Bd. Of Culinary Bartender Trust Fund v. Las Vegas*

13   *Sands, Inc.,* 244 F.3d 1152, 1162 n.3 (9th Cir. 2001).   "All questions of fact and law need not be

14   common to satisfy this rule.  The existence of shared legal issues with divergent factual

15   predicates is sufficient, as is a common core of salient facts coupled with disparate legal

16   remedies within the class."  *Hanlon*, 150 F.3d at 1019; *accord Staton v. Boeing Co.*, 327 F.3d

17   938, 952 (9th Cir. 2003).  Because Plaintiff Middlesex also alleges that the proposed class

18   satisfies Rule 23(b)(3)'s requirement "that the questions of law or fact common to class

19   members predominate over any questions affecting only individual members," the Court here

20   addresses Rule 23(b)(3)'s predominance requirement, which subsumes the less rigorous

21   commonality requirement of Rule 23(a)(2).  *See Achem Prods., Inc. v. Windsor*, 521 U.S. 591,

22   609, 117 S. Ct. 2231 (1997).  The predominance requirement is satisfied "[w]hen common

23   questions present a significant aspect of the case and they can be resolved for all members of the

24   class in a single adjudication."  *Hanlon*, 150 F.3d at 1022 (internal citations and quotations

25   omitted).

26       In a similar securities setting the Ninth Circuit found the commonality and predominance

27   requirements met, stating that:

28             The overwhelming weight of authority holds that repeated

                                    10

1        misrepresentations of the sort alleged here satisfy the 'common

2        question' requirement.  Confronted with a class of purchasers

3        allegedly defrauded over a period of time by similar

4        misrepresentations, courts have taken the common sense approach

5        that the class is united by a common interest in determining whether

6        a defendant's course of conduct is in its broad outlines actionable,

7        which is not defeated by slight differences in the class members'

8        positions, and that the issue may profitably be tried in one suit.

9  *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975).  In the instant case, the alleged

10  misrepresentations fit within a common course of conduct, i.e. Defendants' alleged concealment

11  of Quest's improper accounting for stock option grants, and a common core of documents, for

12  example, Quest's proxy statements, Form 10-Qs and Fork 10-Ks.  In addition, it is undisputed

13  that the instant litigation raises the following common questions that provide the focus of the

14  litigation: (1) whether Defendants violated the Securities and Exchange Act; (2) whether the

15  Defendants falsely represented material facts (3) whether the individual defendants caused Quest

16  to issue false and misleading statements; (4) whether Defendants knew the statements were false

17  and misleading; and (5) whether the price of Quest's publicly traded stock was artificially

18  inflated.

19        Rather than present any arguments that the commonality or predominance requirements

20  are not met, Defendants focus on the related inquiry of typicality.  Thus, the Court addresses

21  those concerns below and otherwise finds that there is a predominance of common legal and

22  factual questions pursuant to Fed. R. Civ. P. 23(a)(2) and Fed. R. Civ. P. 23(b)(3).

23        **D.**    **Typicality**

24        Lead Plaintiff next argues that its claims are typical of the putative class members, thus

25  satisfying the requirements of Rule 23(a)(3).  "The purpose of the typicality requirement is to

26  assure that the interest of the named representative aligns with the interest of the class."  *Hanon*

27  *v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  "Under the rule's permissive

28  standards, the representative claims are 'typical' if they are reasonably co-extensive with those

of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. Thus, this requirement is met where "'each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (*quoting Marisol v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997); *see also General Tel. Co of Southwest v. Falcon*, 457 U.S. 147, 157 n.13, 102 S. Ct. 2364 (1982) (recognizing that the commonality and typicality requirements often merge because both serve to establish whether "maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence").

Plaintiff contends that its claims are typical because it and all members of the class were harmed as a result of Defendants' alleged stock option granting practices occurring throughout the class period; thus the elements of the securities claims here, including liability, causation, and damages are premised on the same facts for Plaintiff and the class members. Defendants respond that Middlesex's claims are atypical because such claims are subject to unique defenses. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citing *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) ("[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.")). By arguing that Middlesex's claims are atypical and implicate unique defenses, Defendants essentially repeat their allegations that Middlesex abdicated full decision-making authority to Seligman and otherwise failed to involve itself in investment decisions.

Defendants primarily rely on two Northern District of Illinois cases to support their position, *Fry v. UAL Corp.*, 136 F.R.D. 626 (N.D Ill. 1991) and *In re Caremark Int'l Inc.*, No. 94 C 4751, 1996 WL 351182, *1 (N.D. Ill. June 24, 1996), which both held that an individual could not function as a class representative when the individual gave third parties full authority to make investment decisions. However, the same court distinguished both opinions when an *institutional investor* seeks to function as a class representative. *See In re Neopharm*, 225 F.R.D. at 567-68. As discussed *supra*, the *Neopharm* Court acknowledged that pension funds

necessarily rely on the expertise of money managers in order to comply with fiduciary duties, and penalizing pension funds for doing so would stand in tension with the PSLRA's intended purpose to increase institutional investors as lead plaintiffs. *Id*. at 567 ("Because Operating Engineers is a pensions fund, it lacks investment expertise and, more likely than not, its fiduciary duties would preclude it from making investment decisions on behalf of its beneficiaries. Thus, to prohibit such an institutional investor from serving as a class representative merely because it delegated investment responsibility to a money manager would appear to be in tension with the PSLRA."); *see also In re WorldCom, Inc., Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003) ("None of the different strategies that these institutional plaintiffs, each of whom is a fiduciary, used to make investment decision on behalf of their beneficiaries suggests that these plaintiffs will be vulnerable at trial to a unique defense that will defeat the presumption that they relied on the public statements about [defendant] that are at issue here, or that will threaten to become the focus of the litigation.").

In addition, the *Neopharm* Court held that the pension fund was not "completely unaware" of the financial affairs central to the case, as the pension fund (1) promulgated investment guidelines for its money manager, (2) conducted reviews of its money manager's investments, (3) used another advisor to monitor the money manager, and (4) retained counsel to monitor its investment portfolio. *See Id*. at 567-68. The record in this case, as discussed above with respect to standing, provides similar facts. The Court will not repeat those already-identified facts in detail here, but notes that Plaintiff engaged Wainwright to monitor Seligman and also retained Wolf Popper to monitor its investment portfolio. In addition, Plaintiff provided Seligman with investment guidelines and also received reports from and conducted meetings with Seligman. As such, the Court finds *Neopharm* persuasive and does not otherwise find Plaintiff's claims for securities fraud atypical. As a result, Plaintiff has satisfied the requirements of Fed. R. Civ. P. 23(a)(3).

### E.    Adequacy of Representation

Plaintiff Middlesex also contends that it and its counsel, Wolf Popper, "will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). "Adequate representation

1    depends on the qualifications of counsel for the representatives, an absence of antagonism, a

2    sharing of interests between representatives and absentees, and the unlikelihood that the suit is

3    collusive." *Las Vegas Sands, Inc.,* 244 F.3d at 1162 (internal quotations and citations omitted).

4    The adequacy inquiry requires the court to ask two questions:  "(1) Do the representative

5    plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will

6    the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the

7    class?"  *Staton*, 327 F.3d at 957.

8         Defendants first argue that Middlesex's monitoring agreement with Wolf Popper creates a

9    conflict of interest rendering Middlesex an inadequate representative, primarily relying on *Iron*

10   *Workers Local No. 25 Pension Fund v. Credit-Based Servicing and Securitization, LLC*, 616 F.

11   Supp. 2d 461 (S.D.N.Y. 2009).  However, the Court is unpersuaded.  First, the *Iron Workers*

12   Court concedes that other courts, including one in this Circuit, recognize such arrangements as

13   rather commonplace and unproblematic.  *See Plumbers & Pipefitters Local 572 Pension Fund v.*

14   *Cisco Sys.*, No. C 01-20418, 2004 WL 5326262, *1, *4 (N.D. Cal. May 27, 2004); *In re Am.*

15   *Italian Pasta Co. Sec. Litig.*, No. 05-0725-CV-W-ODS, 2007 WL 927745, *1, * (W.D. Mo.

16   March 26, 2007) ("The existence of a prior relationship between Lead Plaintiff and Class

17   Counsel is not a problem; in fact, given the extensive investments inherent in the operation of a

18   pension fund, the Court is not surprised Lead Plaintiff has arranged for a law firm to keep it

19   apprised of events (including lawsuits) that might be of interest.  Arguably, a pension fund's

20   failure to take steps to be aware of existing or prospective litigation that affects its investments

21   would be an abdication of duty.").  Indeed, the Court agrees that the absence of a monitoring

22   relationship might constitute the very lack of diligent investment oversight  with which

23   Defendants repeatedly charge Plaintiff.

24        Further, the monitoring agreement in the instant matter is undisputedly different than the

25   agreement that caused concern for the *Iron Workers* Court.  In *Iron Workers*, the court found that

26   evidence presented (both testimony and a written contract) indicated that the pension fund

27   agreed to retain monitoring counsel as lead counsel if the pension fund decided to pursue any

28   securities claims.  *Iron Workers*, 616 F. Supp. 2d at 464.  In essence, the pension fund was

1    *obligated* to use the monitoring counsel if the fund sought to instigate a class action, and the *Iron*

2    *Workers* Court was concerned that such "practice fosters the very tendencies toward lawyer-

3    driven litigation that the PLSRA was designed to curtail." *Id.* Here, nothing in the monitoring

4    agreement between the parties *requires* Plaintiff to use Wolf Popper as counsel if Middlesex

5    decides to pursue litigation, *see* Blair Decl., Exh. M, and Gibson's deposition testimony

6    confirms the same. Furthermore, Middlesex also employed an additional firm, Labaton

7    Sucharow, to monitor its portfolio at the time Wolf Popper raised this potential litigation. And

8    Middlesex represents that it has more often used Labaton counsel to litigate matters than Wolf

9    Popper, suggesting that Middlesex is not overly beholden to Wolf Popper. Finally, as Plaintiff

10   aptly notes, *Iron Workers* dealt with a lead plaintiff motion wherein the court had to decide

11   which of two competing applicants would function as the best lead plaintiff. The instant Court is

12   far beyond that procedural posture.

13       Defendants secondly contend that Middlesex has not and seemingly will not adequately

14   monitor the instant litigation. More specifically, Defendants contend that Middlesex has

15   repeatedly failed to follow its own class action litigation policies and procedures. In addition,

16   Defendants allege that Middlesex's previous violations of its fiduciary duties render it an

17   inadequate class representative.

18       With respect to Defendants' first charge that Plaintiff failed to follow its own class action

19   litigation policies, the Court finds minimal support for this position in the record. For example,

20   Defendants state that the monitoring agreement with Wolf Popper required Middlesex to engage

21   in a cost-benefit analysis prior to bringing suit. However, that agreement does not even speak to

22   a cost-benefit analysis. In addition, while the Court finds it unnecessary to recite all examples,

23   the Gibson deposition testimony again confirms that the board did reflect on the decision to

24   pursue the litigation and determined that it was in the best interest of its fund members. *See,*

25   *e.g.*, Avery Decl., Exh. A at 31 ("[W]e had an obligation to our fund members that when there is

26   a loss occasioned by these circumstances to pursue some redress for that loss. And we felt

27   $145,000 was a significant loss for our fund, and we felt that the fact that Quest went back and

28   had to restate all of their earning, all of their reports was significant."). Furthermore,

1   Middlesex's successful litigation of two motions to dismiss in the instant matter also undermines

2   any argument that it has acted rashly, carelessly, or otherwise in contravention of its class action

3   litigation policies when pursuing this case.

4         With respect to their second charge (i.e. that Middlesex has repeatedly violated its

5   fiduciary duties in the past), Defendants refer the Court to three investigations conducted by the

6   Massachusetts Office of the Inspector General ("Inspector General") and the Massachusetts

7   Public Employee Retirement Administration Commission ("PERAC") into Middlesex's affairs.

8   First, Defendants refer to the "Cambridge Scheme" in which Cambridge Financial Management,

9   Middlesex's currency hedging investment manager, improperly wrote currency options for

10   approximately two years in violation of Middlesex's investment guidelines and without the

11   approval or knowledge of Middlesex or Wainwright.  The scheme, revealed in May 2003,

12   allegedly cost Middlesex over $34 million.  Second, Defendants raise the "Renovation Scheme"

13   in which Defendants contend that Middlesex engaged in self-dealing and a breach of trust with

14   respect to the 2003 renovation of its headquarters.  Third and finally, Defendants contend that

15   the Middlesex board engaged in improper reimbursement of board travel expenses, also

16   evidencing Middlesex's continued breach of fiduciary duties.  Defendants posit that if Middlesex

17   has consistently violated its fiduciary duties to its pension fund members, it will clearly violate

18   such fiduciary duties to class members.  *See Cohen v. Beneficial Indus. Loan Corp*., 337 U.S.

19   541, 549-50, 69 S. Ct. 1222(1949) (recognizing the fiduciary character of a class representative).

20         While a class representative indeed must function as a fiduciary, in order for inadequacy

21   allegations to defeat a certification motion, the Court agrees with Plaintiff that those allegations

22   "must be relevant to the claims in the litigation and must be directed at improper or questionable

23   conduct arising out of or touching upon the very prosecution of the lawsuit."  *Koppel v. 4987*

24   *Corp.*, 191 F.R.D. 360, 368 (S.D.N.Y. 2000) (internal citations and quotations omitted).  While

25   Defendants clearly contend that the three investigations are relevant and not too attenuated from

26   the instant matter because they occurred during the class period, the Court is unpersuaded; the

27   three investigations do not touch upon Middlesex's investment in Quest or relationship with

28   Seligman.  In addition, these three highlighted investigations do not clearly demonstrate the level

of egregious wrongdoing that Defendants seem to suggest. First, as to the Cambridge Scheme (involving only one of Middlesex's fifty investment managers), Middlesex itself sought out the aid of PERAC when it discovered the extent of the scheme, voluntarily participated in the investigation, and ultimately recovered half of the incurred losses for its fund members. In addition, Middlesex's current board members were not on the board during the Cambridge Scheme, suggesting that those who currently run Middlesex are not clearly implicated by any past lack of diligence. With respect to the Renovation Scheme, the Attorney General found no evidence of self-dealing on behalf of the then-board members, and thus instigated no proceedings. Finally, as to the reimbursement issues, Middlesex represents that the board member at issue has since resigned, and by working with PERAC, Middlesex has discontinued the credit card documentation policy that facilitated the improper reimbursements and implemented a new procedure modeled after PERAC guidelines. Thus, the record more clearly supports an inference that Middlesex works diligently to resolve circumstance that may negatively affect its pension fund members.

Lastly, the Court notes that Defendants present no argument that Lead Counsel, Wolf Popper or liaison counsel, Hulett, lack sophistication or expertise in securities litigation, especially in light of their thorough resumes. *See* Avery Decl., Exh G & H. The Court already appointed both firms lead counsel and liaison counsel on January 22, 2007, and sees no reason to question that decision. Thus, with respect to the instant litigation (the primary focus for the Court in determining adequacy), Middlesex and its counsel have shown themselves to be more than diligent and adequate pursuant to Fed. R. Civ. P. 23(a)(4).

### F.     Superiority of Class Method

While the Court has already found the predominance requirement of Rule 23(b)(3) met, the Court must still assess the second requirement that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). This inquiry "requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case [and] necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Hanlon*, 150 F.3d at 1023 (internal

1    citations omitted).  In addition, when evaluating whether a plaintiff has generally met the

2    requirements of Rule 23(b)(3), pertinent matters include, but are not limited to, the following: (1)

3    prospective class members' interests in individually litigating the matter; (2) litigations already

4    commenced relating to the instant controversy; (3) the desirability of litigating claims in a

5    particular forum; and (4) difficulties in managing the class action. FED. R. CIV. P. 23(b)(3)(A)-

6    (D).

7         Defendants provide no argument contending that a class action is not a superior method

8    for resolving this dispute, and the Court finds the instant matter a paradigmatic case for class

9    treatment. *See, e.g. In re Cooper Cooper Companies Inc. Sec. Litig.*, 245 F.R.D. 628, 641-42

10   (C.D. Cal. 2009) (acknowledging that "[d]istrict courts have consistently recognized that the

11   common liability issues involved in securities fraud cases are ideally suited for resolution by was

12   of a class action[,]" and opining that not providing class treatment runs the risk of judicial

13   inefficiency and the unfairness of inconsistent judgments).  In addition, the Court sees no

14   problems with the management of this matter as a class action. *Id.* As such, the Court finds that

15   a class action is a superior method to adjudicate the instant dispute.

16              **G.    Notice of Class Action**

17        Because the Court certifies Lead Plaintiff's class action pursuant to Fed. R. Civ. P.

18   23(b)(3), all class members who reasonably can be located must be notified of the class action.

19   FED. R. CIV. P. 23(c)(2)(B).  The parties are ordered to submit a stipulated notice pursuant to

20   Rule 23(c)(2)(b) for the Court's review on or before Monday, October 19, 2009.

21        **IV.    Disposition**

22        For the foregoing reasons, the Court hereby GRANTS Lead Plaintiff Middlesex's Motion

23   for Class Certification.  In so doing, the Court certifies the following class:

24              All persons and entities who purchased Quest Software, Inc.

25              ("Quest") common stock during the period November 9, 2001

26              through July 3, 2006, inclusively (the "Class Period") and who were

27              damaged thereby (the "Class"); excluding (i) Defendants; (ii)

28              directors and officers of Quest; (iii) subsidiaries and affiliates of

1  Quest; (iv) members of the immediate families of each of the

2  individual Defendants and Quest's officers and directors; (v) any

3  entity in which any Defendant has a controlling interest; and (vi) the

4  legal representatives, heirs, successors and assigns of any such

5  excluded person.

6      In addition, the Court hereby certifies Lead Plaintiff Middlesex as representative of the

7  Class and confirms Lead Counsel Wolf Popper as counsel for the Class and Hulett as liaison

8  counsel.

9  IT IS SO ORDERED.

10  DATED: September 8, 2009

11

12  _David O. Carter_

13  DAVID O. CARTER
    United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28